567 F.2d 429
 13 Fair Empl.Prac.Cas. 1068,
22 Wage & Hour Cas. (BN 1320,
12 Empl. Prac. Dec. P 11,216, 185 U.S.App.D.C. 322,
84 Lab.Cas. P 33,698
 Mary P. LAFFEY et al.
v.
NORTHWEST AIRLINES, INC., Appellant,
Air Line Pilots Association, Non-Aligned Party.
Mary P. LAFFEY et al., Appellants,
v.
NORTHWEST AIRLINES, INC., Air Line Pilots Association,
Non-Aligned Party.
 Nos. 74-1791 and 75-1334.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 9, 1975.
Decided Oct. 20, 1976.
Rehearing and Rehearing En Banc Denied Sept. 8, 1977.
 
 Henry E. Halladay, Minneapolis, Minn., with whom William E. Martin, Minneapolis, Minn., and John L. Richardson, Washington, D. C., were on the brief for appellant in No. 74-1791 and appellee in No. 75-1334.
 Michael H. Gottesman, Washington, D. C., with whom Dennis D. Clark, Robert M. Weinberg and George H. Cohen, Washington, D. C., were on the brief for appellants in No. 75-1334 and appellees in No. 74-1791.
 Linda Dorian, Atty., Equal Employment Opportunity Commission of the bar of the District of Columbia Court of Appeals, Washington, D. C., pro hac vice, by special leave of court, with whom Beatrice Rosenberg and Charles L. Reischel, Attys., Equal Employment Opportunity Commission, Washington, D. C., were on the brief for Equal Employment Opportunity Commission as amicus curiae.
 Robert S. Savelson, New York City, and Donald J. Capuano, Washington, D. C., were on the brief for appellee Air Line Pilots Association. Glenn V. Whitaker also entered an appearance for appellee Air Line Pilots Association.
 A. Andrew Giangreco, Alexandria, Va., and Samuel Borzilleri, Washington, D. C., entered appearances for appellee Transportation Workers Union.
 Before BAZELON, Chief Judge, and TAMM and ROBINSON, Circuit judges.
 Opinion for the Court filed by ROBINSON, Circuit Judge.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 Northwest Airlines (NWA) appeals from a judgment of the District Court[1] declaring certain of its personnel policies violative of the Equal Pay Act of 1963[2] and Title VII of the Civil Rights Act of 1964[3] and granting injunctive and monetary relief. The principal practice in issue here is the payment to women employed as stewardesses of salaries lower than those paid to men serving as pursers for work found by the court to be substantially equal. Others are the provision to stewardesses of less desirable layover accommodations and allowances for maintenance of uniforms, and the imposition of weight restrictions upon stewardesses only. In varying respects and degrees NWA challenges findings of fact[4] and conclusions of law[5] on these matters, as well as the propriety of the remedial measures adopted.[6]
 
 
 2
 On careful review of the extensive record on appeal, we sustain the District Court's adjudications on all substantive questions of statutory infringement. We also uphold most but not all of the court's specifications on relief.[7] Thus we affirm the judgment in part, vacate it in part and remand the case to the District Court for further proceedings.
 
 I. HISTORY OF THE EMPLOYMENT PRACTICES
 A. Stewardess and Purser Positions
 
 3
 Between 1927 and 1947, all cabin attendants employed on NWA's aircraft were women, whom NWA classified as "stewardesses."[8] In 1947, when the company initiated international service, it established a new cabin-attendant position of "purser,"[9] and for two decades thereafter adhered to an undeviating practice of restricting purser jobs to men alone.[10] In implementation of this policy, NWA created another strictly all-male cabin-attendant classification "flight service attendant" to serve as a training and probationary position for future pursers.[11] NWA has maintained a combined seniority list for pursers and flight service attendants, on which seniority as pursers accrued to flight service attendants immediately upon assumption of their duties as such, and a separate seniority list for stewardesses.[12] From 1951 until 1967 flight service attendants had a contractual right to automatic promotion to purser vacancies in the order of their seniority.[13]
 
 
 4
 It was not until 1967, when a new collective bargaining agreement was negotiated, that stewardesses first became contractually eligible to apply for purser positions.[14] During negotiations on the issue, NWA, for both the 1967 agreement and another in 1970, rejected an additional union proposal that stewardesses, like flight service attendants, be allowed to progress to purser slots according to seniority, stating that the company "prefers males and intends to have them."[15] The company has also insisted upon the right of "selectivity" in choosing which stewardesses might become pursers, and has imposed other restrictions on stewardesses seeking purser vacancies which had not previously been laid on flight service attendants.[16]
 
 
 5
 Company policy had been to fill purser openings by hiring "men off the street" and training them for a short time, after which notices of purser vacancies would be posted.[17] Following the 1967 collective bargaining agreement affording stewardesses access to these jobs however, NWA hired five male purser-applicants without ever posting notices of the vacancies.[18] In 1970, after three years of ostensibly open admission purser status, NWA had 137 male cabin attendants all as pursers and 1,747 female cabin attendants all but one as stewardesses.[19]
 
 
 6
 The sole female purser at that time was Mary P. Laffey, who bid for a purser vacancy in 1967, after nine years' service as a stewardess.[20] Although that purser position was scheduled to be filled in November, 1967, processing of her application was delayed assertedly for the reason that NWA needed to administer new tests to purser applicants.[21] These tests had never previously been used in selecting pursers, and during the interim between Ms. Laffey's application and her appointment NWA hired two male pursers without benefit of any tests.[22] Finally, in June, 1968, Ms. Laffey became a purser, but was placed on the bottom rung of the purser-salary schedule and received less than her income as a senior stewardess.[23]B. Stewardess and Purser Duties
 
 
 7
 On this appeal, NWA does not challenge holdings by the District Court that Title VII was violated by NWA's refusal to hire female pursers.[24] Rather, the appeal focuses primarily on whether the payment of unequal salaries to stewardesses and pursers, while occupying positions as such, implicates Title VII and the Equal Pay Act. The purser wage scale ranges from 20 to 55 percent higher than salaries paid to stewardesses of equivalent seniority.[25] The Equal Pay Act[26] forbids this pay differential unless greater skill, effort or responsibility is required to perform purser duties.[27] Title VII[28] likewise proscribes inferior sex-based compensation plans for women and, additionally, extends its protection to ban conditions of employment imposed discriminatorily upon women employees.[29]
 
 
 8
 (1) Flight Assignments
 
 
 9
 In gauging whether NWA's pursers and stewardesses performed equal work, the District Court analyzed in great detail NWA's flight operations and its usage of the three different categories of cabin attendants. NWA flies diverse itineraries, which affect the type of personnel assigned to the flight, and which are categorized by particular terminology. In brief, "pure domestic commercial flights" are regularly-scheduled commercial flights which begin and end in the United States, and do not continue to the Orient.[30] Other commercial flights originate in one city in the United States, fly to an intermediate destination in the United States, and then on to the Orient; and the intra-United States portions of such trips are known as "domestic segments of international flights".[31] "Transpacific commercial flights" are regularly-scheduled flights between Anchorage, Seattle, Honolulu and Tokyo; while "commercial interport flights" are regularly scheduled flights between Tokyo and other Asian cities.[32] "Military air charters" are flights contracted with the United States Government to provide regularly-scheduled military air charter service.[33]
 
 
 10
 Pure domestic commercial flights are, with some exceptions,[34] served exclusively by stewardesses and flight service attendants.[35] Pursers are ordinarily utilized on interport flights, transpacific commercial flights, domestic segments of international flights, and on all types of charters, military or otherwise, including pure domestic flights.[36] Since 1967, the company has also maintained a crew of stewardesses with proficiency in one or more foreign languages, who are assigned to certain international flights.[37]
 
 
 11
 NWA schedules a different cabin-attendant crew on each flight segment; one crew will fly the domestic segment, another will take over for the transpacific link, and still a third is used on the interport portion.[38] Pursers and stewardesses bid separately, according to seniority, for monthly schedules.[39]
 
 
 12
 (2) Overall Evaluation
 
 
 13
 Probing beneath the different titles, bidding schedules and salaries, the District Court made extensive factual findings comparing the work actually done by pursers and stewardesses, and held it to be essentially equal when considered as a whole.[40] For example, pursers are assigned to the first-class section of the aircraft, which has a smaller passenger load per cabin attendant and a correspondingly more leisurely work pace as compared with the chores inherited by stewardesses assigned to the tourist-class section.[41] The hourly work load also tends to be greater on the "short hop" domestic schedules than on the longer international flights.[42]
 
 
 14
 Duties performed do not differ significantly in nature as between pursers and stewardesses. All must check cabins before departure, greet and seat passengers, prepare for take-off, and provide in-flight food, beverage and general services.[43] All must complete required documentation, maintain cabin cleanliness, see that passengers comply with regulations and deplane passengers.[44] The premier responsibility of any cabin attendant is to insure the safety of passengers during an emergency, and cabin attendants all must possess a thorough knowledge of emergency equipment and procedures on all aircraft.[45] All attendants also must be knowledgeable in first aid techniques and must be able to handle the myriad of medical problems that arise in flight.[46] Food service varies greatly between flights, but pursers engage in no duties that are not also performed on the same or another flight by stewardesses.[47] Another important duty building goodwill between NWA and its passengers depends on the poise, tact, friendliness, good judgment and adaptability of every cabin attendant, male or female.[48]
 
 
 15
 (3) Domestic and International Flights
 
 
 16
 The District Court found that when pursers are scheduled on pure domestic flights, their duties are identical to those of stewardesses functioning as "senior cabin attendants" the most senior purser, or the most senior stewardess on flights with no purser.[49] A substantial percentage of NWA's overall utilization of pursers is on pure domestic flights and domestic segments of international flights.[50] Similarly, a substantial percentage of the company's use of pursers is their assignment to military air charter flights.[51] Many pursers fly flights of these types exclusively for months or years at a time.[52]
 
 
 17
 Although, as NWA argues, after January, 1971, pursers as a group have spent more nights away from home than do stewardesses, the District Court found that these longer trips "do not constitute substantially dissimilar working conditions from those of other cabin attendants":[53]
 
 
 18
 More consecutive days away from home also means more consecutive days at home during the month. The preferences of cabin attendants in this regard are highly subjective some prefer one long trip a month, while others prefer shorter trips; . . . . Because ground time is not counted toward flight time, purser schedules (encompassing longer flights) entail fewer actual hours of work . . . .[54]
 
 
 19
 (4) Documentation Tasks
 
 
 20
 With respect to documentation responsibilities, the District Court found that pursers and stewardesses have different, but comparable, duties.[55] Stewardesses alone sell liquor, and are alone required to complete inventory and sales records, and beverage usage reports.[56] On flights carrying tax-free liquor, customs inventory forms must be completed both by stewardesses and pursers,[57] and all cabin attendants are subject to discipline for error.[58] On all flights, the senior cabin attendant and the senior in tourist the senior stewardess in the tourist class must make appropriate entries in the log book,[59] and also prepare an in-flight-service report, seating charts, accident reports and other diverse documents.[60]
 
 
 21
 Pursers are responsible for administering international quarantine procedures for passengers, crew and cargo.[61] As the requirements vary from port to port, pursers must keep their knowledge current in order to comply with applicable regulations.[62] These duties, however, are not required on all flights to which pursers are assigned, such as on pure domestic flights on which pursers perform no documentation duties, and on certain domestic segments on which such purser duties are minimal.[63] To boot, pursers are instructed to carry out their international documentation responsibilities at times when no significant passenger service is required, and other cabin attendants perform all other necessary services during those times.[64] The District Court found that "the documentary duties described which are . . . assigned only to pursers involved no greater skill, effort or responsibility than . . . the stewardess job."[65]
 
 
 22
 (5) Stewardess and Purser Responsibilities
 
 
 23
 The District Court also examined another general, more intangible, duty advanced by NWA as a factor rendering the purser job different in kind from the stewardess position. The company's cabin service manual states that the senior purser on a flight will always be considered the senior cabin attendant and as such must coordinate the activities of the other attendants, and is to be held "responsible and accountable" for the proper rendering of service on that flight.[66] But the manual further provides that if no purser is scheduled, the most senior stewardess will serve as senior flight attendant and will similarly be charged with coordination of cabin service, although she is accountable only for the conduct of service in the section of the aircraft in which she works, responsibility for the remainder being placed on the senior attendant in the other section of the aircraft.[67]
 
 
 24
 Senior cabin attendants, be they purser or stewardess, have a number of supervisory duties. These include monitoring and, where necessary, correcting the work of other cabin attendants; determining the times of meals and movie showings; shifting cabin attendants from section to section to balance workloads; and giving pre-departure briefings on emergency equipment and procedures.[68] On large planes, even if a purser in the first-class section is designated the senior cabin attendant, the senior in tourist shoulders these same burdens in her section of the aircraft overseeing the great majority of passengers and cabin attendants.[69] Stewardess and pursers alike are subject to disciplinary action if they fail to carry out their "supervisory responsibilities."[70]
 
 
 25
 There is, however, no merit system maintained to reward those who "supervise" better than others; all pursers and all stewardesses are on uniform, separate wage scales, regardless of whether or how well an individual performs.[71]
 
 
 26
 NWA asserts that it hired, trained and promoted male pursers in the belief that they would exercise leadership and be "responsible and accountable for the entire cabin service staff," whereas stewardesses functioning as senior cabin attendants on particular flights would be responsible for coordination of cabin service on the entire flight but would be "accountable" only for the manner of service in their assigned sections of the aircraft.[72] The District Court found that, in practice, this distinction between levels of responsibility and accountability is illusory:
 
 
 27
 Only in the purser's formal relationship with the Company does his accountability differ from the non-purser senior cabin attendant and that difference is derived from status rather than as a function of the job. . . .[73]
 
 
 28
 The court found, moreover, that the senior cabin attendant's duties are not substantially greater than the ordinary cabin attendant's function:
 
 
 29
 . . . Cabin service attendants are employed to serve and protect Company passengers. The "supervisory" functions of senior cabin attendants whether purser or stewardess are less important than, and require no greater skill, effort or responsibility, than the other functions assigned to all cabin attendants."[74]
 
 C. The District Court's Conclusions
 
 30
 Careful evaluation of the facts comprehensively found led the District Court to conclude that NWA had discriminated against women cabin attendants on the basis of sex, in violation of Title VII and the Equal Pay Act, by compensating stewardesses and pursers unequally for equal work on "jobs the performance of which requires equal skill, effort and responsibility and which are performed under similar working conditions."[75] More specifically, the court found that NWA had discriminated in "willful violation"[76] of the Equal Pay Act[77] (a) by paying female stewardesses lower salaries and pensions than male pursers; (b) by providing female cabin attendants less expensive and less desirable layover accommodations than male cabin attendants; (c) by providing to male but not to female cabin attendants a uniform-cleaning allowance; and (d) "by paying Mary P. Laffey a lower salary as a purser than it pays to male pursers with equivalent length of cabin attendant service."[78] All of these same actions were held by the District Court also to be violations of Title VII[79] and the court further held that Title VII violations arose out of other forms of company discrimination, inter alia, (a) in filling purser vacancies; (b) in denying to stewardesses who became pursers the same seniority rights and pay given male flight service attendants similarly promoted; (c) in changing procedural requirements for becoming a purser so as to deter female applicants, even after the 1967 agreement;[80] (d) in erecting a "chain of command" on flights under which all male cabin attendants, regardless of seniority or classification, were superior to all females; and (e) in imposing on women alone a ban on eyeglasses, prescribed luggage, and weight and height restrictions.[81]
 
 
 31
 On this appeal, NWA challenges the District Court's central ruling that disparate compensation for equal work violates Title VII additionally to the Equal Pay Act.[82] It attacks also the court's holding that stewardesses and pursers are entitled to equal pay,[83] and the corollary finding that stewardesses who became pursers were improperly denied credit for their stewardess seniority on the purser seniority list.[84] The company also disputes the court's conclusion that Title VII was violated by its policies regarding cleaning allowances and layover accommodations.[85] Lastly, it objects to the remedial measure adopted by the court to cure the conceded violation as to weight restrictions.[86] These contentions, in turn, we now examine.
 
 II. THE APPLICABLE STATUTES
 
 32
 By the Equal Pay Act, adopted in 1963 as an addition[87] to the Fair Labor Standards Act of 1938,[88] Congress ordained:
 
 
 33
 No employer having employees subject to any provisions of this section[89] shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .[90]
 
 
 34
 By Title VII, Congress has also decreed, with exceptions not immediately relevant, that
 
 
 35
 (i)t shall be an unlawful employment practice for an employer
 
 
 36
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 
 
 37
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.[91]
 
 
 38
 It is by these standards that objections to the substantive features of the District Court's judgment are to be gauged on this appeal.
 
 A. Interrelationship of the Statutes
 
 39
 NWA argues that the two statutes, read in pari materia, do not authorize monetary relief premised upon both legislative schemes for the same act of paying disparate wages. It is said that while the Equal Pay Act permits a statutory class action to secure equal pay for equal work by employees of different sexes,[92] Title VII's guaranty of nondiscriminatory "compensation" applies only to such minority groups as are not covered by the Equal Pay Act.
 
 
 40
 NWA further contends that the District Court was inconsistent in finding transgressions of both statutes. The argument in this connection may be summarized briefly. If the purser and stewardess jobs are "equal," and thus support the court's holding of an Equal Pay Act violation, the company's refusal to permit women to become pursers does not deprive them of advancement opportunities because the jobs are equal and thus there can be no encroachment upon Title VII. Conversely, if the purser job is superior, there is no infringement of the Equal Pay Act although access to that position has unlawfully been denied to women under Title VII. NWA does not challenge the court's finding that Title VII was dishonored by the exclusion of female employees from the purser position, but the company does contest the conclusion that the comparability of that position and the stewardess position brings the salary differential between pursers and stewardesses into collision with the Equal Pay Act.
 
 
 41
 We reject these approaches. The District Court's finding that NWA's purser and stewardess jobs are essentially equal in duties and responsibilities is not logically inconsistent with the court's conclusions that NWA impinged on Title VII by blocking the entry of women into the purser category. Although, as the District Court determined, the two jobs require equal "skill, effort, and responsibility" so as to command equivalent salaries under the Equal Pay Act, any statutorily-unexempted sex-based barrier to obtaining a particular job is forbidden by Title VII. Among the options withheld by Title VII from an employer are those which "limit . . . or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's . . . sex . . . ."[93] Notwithstanding, NWA classified its cabin attendants more prominently as all-female stewardesses and all-male pursers, and barred women applicants from the ranks of the latter though capable through existing employment and accrued experience with NWA to meet all of its purser-criteria save sex. That plainly was outlawed by Title VII as a sex-founded deprivation of employment opportunities, not the least of which were the superior emoluments which NWA bestowed on the purser position.[94]
 
 
 42
 Nor do we doubt that the same set of facts may form the basis for redress under both Title VII and the Equal Pay Act if the requirements of each are separately satisfied and the claimant does not reap overlapping relief for the same wrong. Unless foreclosed by the statutory language or history, nothing to rob aggrieved parties of the freedom to select among multiple remedies for separate though concurrent statutory violations is apparent.
 
 
 43
 Title VII rights are independent of the rights created by other statutes, and where remedies coincide the claimant should be allowed to utilize whichever avenue of relief is desired.[95] This would seem to be the clearer for claimants under Title VII which, as the Supreme Court held in Alexander v. Gardner-Denver,[96] was intended to "supplement, rather than supplant, existing laws . . . relating to employment."[97] The Court has also noted that the legislative history of Title VII "manifests a congressional intent to allow an individual to pursue independently his rights under Title VII and other applicable state and federal statutes."[98] During the pre-enactment debates, Congress rejected a proposed amendment which would have made Title VII the exclusive remedy for the unlawful employment practices it covers, and thereby evinced a congressional purpose to leave open other modes of relief available to victims of discriminatory employment practices.[99]
 
 
 44
 Although Title VII reaches farther than the Equal Pay Act to protect groups other than those sex-based classes and to proscribe discrimination in many facets of employment additional to compensation, nowhere have we encountered an indication that Title VII was intended either to supplant or be supplanted by the Equal Pay Act in the relatively small area in which the two are congruent. On the contrary, we are satisfied that the provisions of both acts should be read in pari materia, and neither should be interpreted in a manner that would undermine the other.[100] In Orr v. Frank R. MacNeill & Son, Inc.,[101] the Fifth Circuit declared that "(t)he sex discrimination provision of Title VII of the Civil Rights Act of 1964 must be construed in harmony with the Equal Pay Act of 1963."[102] We agree, and we now so hold.
 
 
 45
 Moreover, the language of Title VII itself explicitly declares that it is unlawful for an employer to offer an employee discriminatory "compensation . . . because of such individual's . . . sex."[103] The legislative history of Title VII yields no hint that the guaranty of nondiscriminatory compensation was extended only to minority groups not embraced within the Equal Pay Act. Indeed, Title VII refers specifically to the Equal Pay Act and states that a sex-predicated wage differential is immune from attack under Title VII only if it comes within one of the four enumerated exceptions to the Equal Pay Act.[104] This, then, focuses our inquiry once again upon whether the District Court correctly found that the employee-litigants had overcome the factors urged by NWA as proof that the stewardess and purser jobs were unequal, or whether NWA had sustained an affirmative defense under one of the Equal Pay Act's exceptions permitting limited instances of disparate pay for equal work.
 
 B. The Union and the Statutes
 
 46
 We must pause further to consider a recurrent theme in NWA's attack on the District Court's findings that particular company practices are discriminatory. NWA contends that union negotiations during the discriminatory era when the practices went unchallenged should be considered compelling evidence of an understanding that the stewardess and purser positions were dissimilar and that pursers accordingly deserved higher pay. The Company implies, in essence, that complaining employees should now be estopped from challenging these practices because their union in which women are dominant agreed to the wages and conditions of employment now impugned. We are not impressed by this argument.
 
 
 47
 The judicial function called into play here is not to assess the union's assumptions, but to determine whether the jobs in question were actually equal within the contemplation of the Equal Pay Act.[105] The evidentiary worth of the union's actions as a reflection of its own underlying evaluation of the characteristics of the two jobs is exceedingly weak. Beyond that, the union's agreement to negotiated terms is hardly evidence of an individual member's appraisal of the skills, efforts, and responsibilities essential to performance of the jobs. Particularly is this so where, as here, the union was bound to represent pursers as well as stewardesses,[106] and took on that responsibility at a time when earlier company policy had already created a status quo under which pursers were more highly paid than stewardesses. Since the union's obligation thenceforth was to seek pay raises benefiting all its members, it obviously was not in a position to alter substantially the position of one constituent group at the expense of another.[107] And when the union did attempt to win better treatment for stewardesses, it encountered stiff resistance from NWA.[108] The only logical inference from this combination of circumstances is that as a matter of strategy not attributable to any belief as to the comparability of the two jobs the union chose to forego a special demand for equality for the stewardesses in order to achieve more pressing bargaining objectives.
 
 
 48
 More fundamentally, union activity cannot strip individual employees of the opportunity to seek vindication of their statutory entitlements in court. Rights established under Title VII and the Equal Pay Act are "not rights which can be bargained away either by a union, by an employer, or by both acting in concert."[109] It cannot be gainsaid that NWA played an instrumental role in the negotiations leading to adoption of the discriminatory wage scales,[110] and a collective bargaining agreement perpetuating prior pay discrimination affords the employer no defense to a charge under the Equal Pay Act.[111] We hardly need to mention that if the union also contributed to the discriminatory scheme, the claimant has a cause of action against the union as well.[112]
 
 III. THE EQUAL PAY ACT CLAIMS
 
 49
 As the Third Circuit has said, the Equal Pay Act
 
 
 50
 was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it.[113]
 
 
 51
 And as the Supreme Court has declared,
 
 
 52
 Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry the fact that the wage structure of "many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." S.Rep.No.176, 88th Cong., 1st Sess., 1 (1963). The solution adopted was quite simple in principle: to require that "equal work will be rewarded by equal wages." Ibid.[114]
 
 A. The Guiding Principles
 
 53
 An Equal Pay Act claimant must show that her salary was lower than that paid by the employer to "employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."[115] The claimant bears the onus of demonstrating that the work unequally recompensed was "equal" within the meaning of the Act.[116] Once this has been done, the claimant will prevail unless the employer asserts as an affirmative defense that the wage differential is justified under one of the four exceptions enumerated in the Act "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."[117] If one or more of these defenses is invoked, the employer bears the burden of proving that his policies fall within an exempted area.[118] This interpretation of the procedural mechanics of the Equal Pay Act comports with the construction of other provisions of the Fair Labor Standards Act, of which the Equal Pay Act is a part, by which statutory exceptions and exemptions are considered matters of affirmative defense to be proven by the employer.[119]
 
 
 54
 One of the more frequent controversies aroused by the Equal Pay Act has involved litigants' attempts to demonstrate that jobs with different titles and descriptions are in reality equal in their calls upon the jobholders. The contest often necessitates an assessment of the significance of differences in job demands advanced by the employer to show that the jobs are not equal. For "(it) is now well settled that jobs need not be identical in every respect before the Equal Pay Act is applicable";[120] the phrase "equal work" does not mean that the jobs must be identical, but merely that they must be "substantially equal."[121] A wage differential is justified only if it compensates for an appreciable variation in skill, effort or responsibility between otherwise comparable job work activities.[122]
 
 
 55
 The Department of Labor has promulgated an extensive series of regulations[123] to guide the "application of the equal pay standard, (which) is not dependent on job classifications or titles but depends rather on actual job requirements and performance. . . ."[124] One regulation states:
 
 
 56
 Congress did not intend that inconsequential differences in job content would be a valid excuse for payment of a lower wage to an employee of one sex than to an employee of the opposite sex if the two are performing equal work on essentially the same job in the same establishment.[125]
 
 
 57
 Another points out that "(i)nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable."[126]
 
 
 58
 These regulations are entitled to "great deference" by the courts in applying the Equal Pay Act to given factual situations.[127] Courts have consistently held that differences in the duties respectively assigned male and female employees must be "evaluated as part of the entire job."[128] Thus, if in the aggregate the jobs require substantially similar skills, efforts and responsibilities, the work will be adjudged equal despite minor variations.[129]
 
 
 59
 When there is a disparity between salaries paid men and women for similar positions bearing different titles such as pursers and stewardesses the courts have scrutinized the evidence to discern whether the salary differential is justified by heterogeneous duties.[130] Another regulation of the Department of Labor states in relevant part,
 
 
 60
 (i)n determining whether job differences are so substantial as to make jobs unequal, it is pertinent to inquire whether and to what extent significance is given to such differences in setting the wage levels for such jobs. Such an inquiry may . . . disclose that apparent differences between jobs have not been recognized as relevant for wage purposes. . . .[131]
 
 
 61
 An employer cannot justify a pay differential by mere assumptions on career-orientation, the duration or probable length of working time, or a supposed respect for male authority and leadership.[132] Moreover, "training programs which appear to be available only to employees of one sex will . . . be carefully examined to determine whether such programs are, in fact, bona fide."[133]
 
 
 62
 An employer must show a consistent pattern of performance of additional duties in order to demonstrate that added duties are genuinely the motivating factor for the substantially higher pay. It is not sufficient that an increased workload might hypothetically have commanded a higher salary if it is not in fact the basis for a significantly greater wage. The employer may not fabricate an after-the-fact rationalization for a sex-based pay difference. "(T)he semblance of (a) valid job classification system may not be allowed to mask the existence of wage discrimination based on sex."[134]
 
 
 63
 Often, evidence superficially purporting to justify greater pay as compensation for added work is found upon close examination to have inconsistencies which render its evidentiary value weaker. Where, for example, all male employees receive greater pay but only some perform the extra tasks allegedly justifying that pay, a reasonable inference is that maleness not the added chores is the basis for the higher wage. This is particularly true if the duties are of peripheral importance and the increase in pay is substantial.[135] Moreover, if some women without added compensation render the same extra performance that purportedly justified the pay differential favoring men, the inference becomes even stronger that the duties are irrelevant to the wage setting.[136] Similar evidence of discriminatory wage patterns is to be found where women are paid only for the amount of time actually spent on the extra work, but men are uniformly paid at the higher rate regardless of whether or not they are doing the work.[137] Additionally the Fourth Circuit has found corroborative evidence that higher pay is not related to extra duties when "qualified female employees are not given the opportunity to do the extra work."[138] The conclusion to be drawn, when any of these inconsistent patterns exists, is that
 
 
 64
 (d)espite claims to the contrary, the extra tasks were found to be makeweights. This left sex which in this context refers to the availability of women at lower wages than men as the one discernible reason for the wage differential. That, however, is precisely the criterion for setting wages that the Act prohibits.[139]
 
 B. The Case at Bar
 
 65
 Applying these principles to the instant case, we perceive no error in the District Court's conclusion that the alleged differences in occupational duties proffered by NWA to justify the higher wage paid to pursers do not demonstrate that the stewardess and purser jobs are disparate. The court found that there is a uniform pay-scale for pursers which exceeds the pay-scale for stewardesses; and that these contrasting schemes are uncorrelated with pursers' and stewardesses' respective employment burdens. Pursers flying exclusively on domestic routes with no international documentation obligations are compensated evenly with pursers on international flights,[140] despite the company's insistence that the onus of international flying is one of the explanations of the greater purser salary. To be sure, stewardesses who staff international flights do receive a foreign-flying supplement, but pursers' pay remains 20 to 35 percent larger than that of stewardesses of comparable seniority engaging solely in international travel.[141]
 
 
 66
 Pursers consistently assigned to flights on which they do not function as the senior cabin attendant receive the same salary as those flying constantly in that capacity,[142] while stewardesses rendering like service derive no supplemental income.[143] A greater mantle of supervisory responsibility supposedly inherent in the position of senior cabin attendant thus does not exonerate the extra compensation awarded pursers. In fact, stewardesses' supervisory labors may exceed those of pursers. The more junior cabin attendants who need more supervision are relegated by the seniority flight-bidding system to the tourist-class section of the least desirable domestic flights, and the probability is that a stewardess acting as senior cabin attendant or senior-in-tourist will be charged with training as well as normal supervision.[144] Pursers, possessing the bidding power to obtain the more popular flights, are positioned in the first-class section with the more senior stewardesses, who require little or no supervision.[145] The District Court further found that "a substantial percentage of the Company's overall utilization of pursers consisted of their assignment . . . exclusively, for months or years at a time,"[146] to flights on which their functions are "identical"[147] to or "less demanding"[148] than stewardesses' tasks.
 
 
 67
 In sum, stewardesses are confined to the same lower salaries, whether or not flying as the senior cabin attendant, regardless of how taxing the service on their flights may be, and irrespective of the performance of documentation work. Pursers, at all times and under all conditions, received substantially superior salaries.[149] This evidence leads convincingly to the conclusion that the contrast in pay is a consequence of the historical willingness of women to accept inferior financial rewards for equivalent work precisely the outmoded practice which the Equal Pay Act sought to eradicate.[150]
 
 
 68
 Nor can NWA reasonably contend that it gives pursers higher salaries because, as a group, they discharge extra duties more frequently than stewardesses, and thus for accounting convenience are recompensed equally. As the District Court found, the company "maintains records which enable it to determine what flight a given cabin attendant has flown each day, the position held each day, and the time spent by that cabin attendant each day."[151] But as the court further found,
 
 
 69
 (t)hese records enable the Company to pay cabin attendants different amounts for different portions of their monthly service. (Flight service attendants) temporarily filling pursers vacancies are paid the purser rate only while flying as pursers. Stewardesses flying international receive the "foreign flying" supplement only for the hours spent on the international flight. Permanently assigned pursers receive the purser rate . . . whether or not they are filling the purser position on the flight and irrespective of the kind of flight, domestic, foreign or interport. Except for the "foreign flying supplement" all stewardesses of a given longevity receive the same salary, irrespective of the nature of the flights or the position occupied on the flight.[152]
 
 
 70
 The records would facilitate the ascertainment of differential salaries for dissimilar portions of the monthly service if in fact the activities purportedly justifying the larger salary were really the reason for the added compensation.
 
 
 71
 It is not legally appropriate to accord stewardesses salary increments only when they serve as the senior cabin attendant. We have pointed to the inconsistencies between occupational tasks and rewards to underscore our conviction that the District Court properly concluded that any greater duties demanded of pursers is not the foundation for their higher pay.[153] In no way does this detract from the court's finding that the senior-cabin-attendant function was a mission that did not alter the basic equality of all cabin attendant jobs:
 
 
 72
 The "supervisory" functions of senior cabin attendants whether purser or stewardess are less important than, and require no greater skill, effort or responsibility, than the other functions assigned to all cabin attendants.[154]
 
 
 73
 We cannot say that this finding is clearly erroneous, and it follows that all cabin attendants perform equal work and are legally entitled to places on equal salary scales. Although the senior cabin attendant is "responsible" for the cabin crew during the flight, the Secretary of Labor's regulations define job responsibility in terms of the degree of employee accountability for job performance.[155] At the trial of this case, witnesses testified that both pursers and stewardesses are disciplined substantially less for unsatisfactory performance as senior cabin attendant than for subpar passenger service. And although the company imposes rigorous sanctions on cabin attendants charged with misconduct affecting customer relations, its records disclose only one instance of disciplinary action against a purser for failure to adequately monitor the work of other cabin attendants. This strongly suggests that the provision of high quality service to passengers exacted of all cabin attendants is the most important undertaking for which the company compensates pursers and stewardesses. The increased responsibility borne by the more senior personnel in both classifications is rewarded by larger salaries given to those on the upper rungs of the pay ladder, and this will continue with a combined stewardess-purser salary scale.
 
 
 74
 In a similar case, the Fifth Circuit reversed a finding that a salary differential between male and female bank tellers was justified by the men's supposedly greater managerial role in "supervising the cashing of checks, helping the other tellers balance out, and generally acting as 'trouble-shooter' when unusual or difficult problems arose."[156] The court found it "doubtful at best that such small, insignificant additional duties can ever serve as a justification for the differential evidenced in the Bank's wage figures."[157] We affirm the District Court's findings that NWA purser and stewardess positions are substantially equal within the intent of the Equal Pay Act and demand financial response at the purser-level of recompense.[158]
 
 IV. THE TITLE VII CLAIMS
 
 75
 The Equal Pay Act's ban on sex-based discrimination in pay is largely paralleled by Title VII's condemnation of "discriminat(ion) against any individual with respect to his compensation . . . because of such individual's . . . sex . . . ."[159] So it is that NWA's policy of rewarding stewardesses unequally for work equal to that of pursers, which we have just confirmed as an Equal Pay Act violation, meets a similar fate under Title VII.[160] The District Court so held,[161] and its judgment directs back pay under Title VII to each shortchanged employee for any period that it is nonrecoverable under the Equal Pay Act.[162] Remedies aside,[163] we face no further Equal Pay Act problem as to stewardesses' salaries.
 
 
 76
 NWA does, however, protest rulings by the District Court that other company policies tread on stewardesses' statutory rights.[164] The areas of controversy are marked by the stewardesses' complaints of discrimination in the provision of layover accommodations for cabin attendants, in company allowances for maintenance of their uniforms, and in weight restrictions formally imposed only on women. While the first two complaints might be addressed independently under the Equal Pay Act on a theory of wage discrimination,[165] or perhaps even under Title VII as a matter of discrimination in compensation,[166] we may acceptably approach the three primarily on the basis of Title VII's ban on "discriminat(ion) against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex . . .."[167]
 
 
 77
 Until recently, only female stewardesses were subject to the company's weight restrictions, which if exceeded resulted in suspension or discharge.[168] Stewardesses in times past at least were also required to share rooms with each other during flight layovers, while male cabin attendants were routinely reimbursed for single rooms.[169] In addition, as the District Court found, the company's allowances for the cleaning and replacement of uniforms differ to the detriment of female cabin attendants.[170] These policies, which have operated disadvantageously upon employees who are women, clearly deprived stewardesses of rights secured by Title VII. NWA does not contend that the practices do not constitute discriminatory conditions of employment, but defends its conduct as inadvertent and unintentional. We find this defense unavailing. The legislative history of Title VII indicates that the Act requires only a general intent to discriminate,[171] and prohibits any discriminatory practice which was not merely accidental.[172] If an employer intends to promulgate the later found to be improper policy that is, "the defendant meant to do what he did"[173] there is no burden to show additional discriminatory motivation in order to recover under Title VII.[174]
 
 
 78
 The company counters the charge of discrimination in the provision of layover accommodations by insisting that male cabin attendants were instructed to share rooms but that they departed from company policy by booking single rooms.[175] The District Court nonetheless upheld the charge[176]and its ruling is amply sustained. NWA has consistently paid for single accommodations for male employees.[177] That more than sufficiently manifests an attitude condoning the alleged breach of company policy.
 
 
 79
 NWA has also seen fit to differentiate its stipends for maintenance of uniforms. Men were given a cleaning allowance, while women received a replacement allowance. On evidence comparing the frequency of uniform replacement with the cost of keeping a supply of clean uniforms, the District Court found the policy discriminatory. We discern nothing in the record to disturb this finding.
 
 
 80
 Prior to suit, the company applied a different maximum height restriction to male and female employees. That differential was likewise held to be discriminatory.[178] Additionally to reinstatement and backpay for stewardesses suspended or terminated for failure to satisfy the weight restrictions,[179] the District Court enjoined NWA from weighing stewardesses, maintaining weight scales, conditioning employment upon an agreement to meet these standards, and punishing any female employee because of weight "unless (it) is such as to render her physically incapable of performing the duties of the job."[180] We affirm the court's resolve to accord reinstatement and backpay to those who suffered from the application of the weight requirements.[181] NWA, however, appeals that portion of the order enjoining the imposition of any weight standard upon any stewardess unless weight prevents discharge of the responsibilities of the employment. NWA has promulgated new weight restrictions for both male and female employees, to operate in a nondiscriminatory fashion. NWA insists that these standards affect everyone equally, bringing it into compliance with Title VII, and that may well be so. If the present regulations, applied objectively and in good faith, pass muster under Title VII, the company will become entitled to modification of this aspect of the injunction by the District Court. The Company must, however, be prepared to demonstrate that the current restrictions are not a veiled means of retaliation for the institution of this action.[182]
 
 
 81
 We recognize that Title VII discourages the use of even nondiscriminatory but newly-promulgated employee-selection criteria where there is a history of discriminatory treatment of some employees who would continue to be hurt by the new criteria. In Griggs v. Duke Power Company,[183] the Supreme Court forbade the application of a fair and even-handed standard to black employees who had been barred from formerly "white" jobs when the selection criteria had applied only to blacks:
 
 
 82
 Under the Act, practices, procedures or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.[184]
 
 
 83
 Similarly, the Second Circuit has affirmed an order requiring admission of incumbent black employees to apprenticeship programs if they were "at least as qualified as the least qualified white" previously accepted, despite the subsequent adoption of a more stringent, nondiscriminatory admission standard.[185] And the Equal Employment Opportunity Commission provides by regulation that
 
 
 84
 no new test or other employee selection standard can be imposed upon a class of individuals protected by title VII who, but for prior discrimination, would have been granted the opportunity to qualify under less stringent selection standards previously in force.[186]
 
 
 85
 Applied to the instant case, this principle protects the right of suspended or discharged stewardesses to be reinstated, to be awarded backpay and to have their personnel files rectified for the period of discipline for failure to comply with a restriction which was not imposed on pursers.[187] At that juncture, the position of these stewardesses will be equalized with that of all pursers who were employed during the same period regardless of weight. The stewardesses discriminated against in the past are thus afforded an opportunity to regain their jobs and, on a parity with the most overweight purser employed by NWA, meet the requirements in the future. As long as the company henceforth extends equal treatment in this regard to all pursers and stewardesses in its employ including all pursers hired in the past, who now must measure up to the new restrictions or be discharged we cannot say that its desire for trimness in those representing it in public is discriminatory or unreasonable. We affirm, then, the District Court's conclusion that the inferior pay scales and working conditions to which stewardesses have been subjected entitles them to relief under Title VII and the Equal Pay Act.
 
 V. THE REMEDIAL ORDER
 
 86
 The District Court's judgment is devoted in substantial measure to remediation of violations found, under either the Equal Pay Act or Title VII, with respect to sex-based differentials in salaries, pensions, layover lodgings furnished and uniform-maintenance allowances.[188] In each category, the judgment effects an equalization upward[189] by mandating for female employees the same treatment that NWA had theretofore afforded male employees,[190] and enjoins sex discrimination in any significant aspect of employment of cabin attendants[191] in the future.[192] The judgment also awards backpay[193] under the Equal Pay Act to each "Equal Pay Act plaintiff"[194] for the three-year period preceding the filing of that plaintiff's written consent to joinder in the suit as a claimant therefore;[195] it similarly grants backpay under Title VII to each "Title VII plaintiff"[196] for the period commencing two years prior to the filing of the first charge with the Equal Employment Opportunity Commission,[197] terminating, however, for each employee who is also an Equal Pay Act plaintiff at the beginning of her Equal Pay Act recovery period.[198] NWA complains that some of these provisions go too far, and affected employees insist that the relief granted on these subjects does not extend far enough.
 
 
 87
 A. Period of Backpay Recovery Under the Equal Pay Act
 
 
 88
 Congress has imposed time limits upon the initiation of employee suits under the Equal Pay Act for either backpay or liquidated damages. The relevant statute specifies that any such action
 
 
 89
 may be commenced within two years after the cause of action accrued, and . . . shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued . . . .[199]
 
 
 90
 The District Court found NWA's Equal Pay Act violation "willfull" within the meaning of this provision[200] and awarded the Equal Pay Act plaintiffs[201] backpay[202] for three-year periods preceding the filing of timely written consents.[203] NWA contends that retrospection of its backpay liability for periods exceeding two years is an erroneous application of the statute. The core argument, as we understand, is that the statutory word "willfull" connotes an unwholesome state of mind said to be absent in this case, particularly since in an independent ruling the District Court denied liquidated damages upon a finding that NWA's sex-discriminatory policies were pursued in good faith.[204](1) The Standard For Determining Willfulness
 
 
 91
 The suit-limitation provision does not undertake to define "willfull" on its own, nor have we encountered elsewhere in companion legislation any definition seemingly referable to that provision.[205] Courts wrestling with its facial ambiguity have usually subscribed to one or the other of two divergent views. Some, notably in the Fifth Circuit, read "willfull" as requiring nothing more than knowledge of the possible applicability of the governing statute to the conduct eventually held to be legally wanting.[206] "Stated most simply," says the Court of Appeals for that circuit, "we think the test should be: Did the employer know the (statute) was in the picture."[207] Other courts take a differently worded approach:[208] "(W)illful," declares one, "retains its traditional meaning that violations of the Act must be deliberate, voluntary and intentional."[209] NWA urges upon us still another meaning: that "willfull" requires bad purpose as an element of the violation.
 
 
 92
 Under some statutes, particularly those directed at conduct involving moral turpitude, an act is "willfull" only if done malevolently, wickedly or criminally.[210] Under other types of statutes, it suffices that the act was performed consciously and voluntarily, rather than inadvertently or accidentally.[211] Betwixt these two formulations, "willfull" has been given various other meanings,[212] although shades of difference ofttimes diminish when the probe extends beneath the surface.[213] Because of its inherent instability, only the most careful consideration of the term "willfull" in its legislative context can provide satisfactory assurance that eventually it will take on its proper cast.[214] And so it does here.
 
 
 93
 The suit-limitation provision in its original form was part of the congressional response to an "existing emergency"[215] three decades ago. In 1946, the Supreme Court had held that employees were entitled to portal-to-portal pay under the Fair Labor Standards Act.[216] In 1947, Congress declared that allowance of claims therefor would create "wholly unexpected liabilities, immense in amount and retroactive in operation,"[217] and enacted legislation to deal with the situation.[218] A limitation period of two years for all claims[219] was designed specifically to eliminate differences arising from "the varying and extended periods of time for which, under the laws of the several States, potential retroactive liability may be imposed upon employers . . . ."[220] Its aim thus was to establish for employee recoveries a nationally uniform cutoff point, whether for purposeful or innocent transgressions of the Act.
 
 
 94
 The limitation period continued at two years until enactment of the Fair Labor Standards Amendments of 1966.[221] During the process leading to that legislation, an effort was made to enlarge the limitation period to three years for any type of violation, for reasons expressed by the then Secretary of Labor:
 
 
 95
 The lengthening of the statute of limitations to three years will allow workers more time to familiarize themselves with their legal right to back wages and thus improve enforcement of the Act. The short statute of limitations gives competitive advantage to violators and penalizes many workers in the collection of wages legally due. The Federal Criminal Statute runs for three years or more. The existing two-year period under (the Fair Labor Standards Act) is also shorter than that allowed creditors of employees to collect money owed for food and rent bills.[222]
 
 
 96
 As the bill emerged from committee, however, the limitation provision appeared in its current form.[223] The period had been lengthened to three years for a "willfull violation," but for others it remained at two.[224] We have not uncovered any clear-cut statement in the legislative history as to why the extension to three years was thus encumbered. There is ample room, however, for an informed belief that, with the amendments' broad expansion of the Act's coverage[225] and resultant concern over the effect on the small businessman,[226] an unqualified increase of the limitation period would bear too heavily upon an inevitably larger group of excusably inadvertent violators.[227]
 
 
 97
 Be that as it may, the important consideration is the absence from the legislative history of any visible movement to impart criminal-law precepts of moral culpability into the statutory scheme as a condition to accountability for a civil wrong. There is nothing to suggest that the congressional effort either in 1947 or 1966 was the exaction of a penalty, to which moral culpability would be highly relevant. On the contrary, the implication is almost irresistible that the objective consistently was the erection of a bulwark to extensive liability, and to economic hardships that would follow. Because in 1947 Congress feared a crisis from enforcement of an unexpected multitude of newly-arising claims, and because in 1966 the coverage of the Act was being greatly widened to encompass a host of enterprises never before subjected, it seems evident that on each occasion Congress wished to insure that those who were unwittingly intercepted by the Act were not impacted with a three-year statute of limitations. These circumstances undergird the unlikelihood that "willfull," in this role, was intended to exact bad purpose on the employer's part rather than simply a lesser factor reducing the employer's predicament to something less than a wholly unanticipated prospect of late-found liability as a precondition to an extra year's recovery.
 
 
 98
 It seems also significant that the requirement of willfulness is not one which must be met in order that there be liability, but rather is one to be satisfied before there can be expanded liability. The nonwillful character of a violation of the Act does not defeat recovery, although it does confine the period therefor to two years, and a willful violation lengthens the period merely by another year. An employer out of compliance, but not willfully so, is spared the burden of recompense beyond a period of two years; an employer willfully out of compliance, despite his willfulness is spared beyond a period of three years. The relatively small difference between the two- and three-year periods tends to question any notion that the distinguishing criterion was to be moral rather than intellectual culpability. Since a morally innocent employer is nonetheless liable for two years, one may ask why a "willful" violator's accountability is for only one year more if the term is to imply wicked purpose.
 
 
 99
 We realize, of course, that a lighter burden would subject a good many employers to the extra year of liability notwithstanding that their violations may represent little or no more than an erroneous interpretation of the statutory requirements. On the other hand, employers as a class occupy a much superior position vis-a-vis their employees to ascertain the effect of the law upon their business policies and practices. Even where the closeness of the question of the statute's applicability hampers or forestalls absolute decisional accuracy, there is no good reason for translating the employer's error into a loss of pay for the employee.
 
 
 100
 Atop all else, the Equal Pay Act, and the Fair Labor Standards Act of which the former is a part, undoubtedly are remedial statutes, as such to be liberally construed in favor of their intended beneficiaries.[228] In light of this, as well as the historical backdrop against which we must view this legislation, we could not readily attribute to Congress a purpose to impose upon employee-claimants the much heavier burden sometimes, perhaps, a well-nigh impossible burden of proving an iniquitous employer state-of-mind as a prerequisite to a backpay recovery for the third year. We reject, then, a definition of "willful" in the suit-limitation provision which would demand proof that the employer entertained a bad purpose or an evil intent. At the same time, we need not go so far as to hold that a violation is willful merely because from the employer's viewpoint the statute was in the picture.[229] Nor need we undertake to precisely define "willful" for cases closer than the one at bar.[230] We think that at the very least the employer's noncompliance is "willful" when he is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt.[231] We think, too, that the same conclusion follows when an equally aware employer consciously and voluntarily charts a course which turns out to be wrong.[232] Beyond these holdings, we need not venture now.
 
 
 101
 (2) The Decision On NWA
 
 
 102
 The District Court expressly found NWA's multifold violations of the Equal Pay Act to be "willful".[233] The court explained:
 
 
 103
 The Equal Pay Act violation was willful in that (NWA) was fully aware of the Equal Pay Act and adopted a deliberate and knowing course of conduct despite its awareness. The Court does not find an intentional, bad faith, attempt to evade the law. The judgment of (NWA) that its conduct would not be found to be in violation of the Equal Pay Act has been found to be in error. The conduct of (NWA) in the exercise of that judgment was willful.[234]
 
 
 104
 This finding is fully binding upon us unless "clearly erroneous."[235] NWA does not say that the finding lacks evidentiary support in the record, nor could it. An official of NWA testified by deposition that since 1963 the company was aware of the Equal Pay Act, was generally familiar with its provisions, and had internally reviewed it for its possible application to the company.[236] NWA understood the Act's central provision that male and female employees cannot be paid differently for performing substantially the same work, and considered its own policies respecting cabin attendants in that light.[237] The company concluded that the Act was inapplicable because it felt that the purser and stewardess jobs were substantially different.[238] Even after the filing of charges with the Equal Employment Opportunity Commission and the subsequent filing of this lawsuit, NWA continued to adhere to that position.[239] No written memorandum on the subject was prepared or received by the company, although it may have been provided oral advisories by a trade association.[240] The witness had no recollection that NWA ever conferred with outside counsel on the subject, and he did not specifically mention any sort of legal advice at all.[241] We have not been referred to, nor have we discovered, any other evidence bearing on the subject. We think the witness' testimony amply sustains the District Court's finding that NWA "was fully aware of the Equal Pay Act and adopted a deliberate and knowing course of conduct despite its awareness."[242]
 
 
 105
 NWA asserts, however, that the facts found are legally insufficient to enable the conclusion that the violation was "willful." It argues for an interpretation of the term which would require bad purpose or evil intent,[243] which the District Court's findings disclaimed.[244] We have declined acceptance of that definition of willfulness,[245] and in our view of the most that willfulness involves[246] we are satisfied that the necessary elements are present here. NWA not only knew of the Equal Pay Act and its content but also correctly understood its prohibition on different salary levels for men and women performing substantially similar work. With little or nothing beyond internal consideration by laymen even after the present legal challenge got under way the company consciously though erroneously concluded that its treatment of pursers and stewardesses was unaffected by the Act. We deem that sufficient to comprise willfulness; in the District Court's words, "(t)he conduct of the Company in the exercise of that judgment was willful."[247] For reasons already extensively articulated,[248] we agree.
 
 
 106
 It is also contended by NWA that the District Court was logically inconsistent in finding that the Equal Pay Act violation occurred in good faith[249] and in also finding that the violation was willful. This claim is of a piece with NWA's insistence that willfulness is inextricably tied to bad purpose.[250] We have said that it is not;[251] we have equated willfulness, rather, with conduct which is conscious and voluntary in character.[252] It follows that a practice may be deliberate, and thus willful, notwithstanding motivation that is honest. Even if NWA pursued in good faith the policies which the District Court held to be unlawful, its conduct was willful within the meaning of the limitation provision.
 
 B. Good Faith
 
 107
 To each affected employee, an employer infringing the Equal Pay Act is statutorily liable, in consequence of its interrelationship with the Fair Labor Standards Act,[253] not only for unpaid compensation but also for "an additional equal amount as liquidated damages."[254] The predicate for the latter imposition is the reality that "(t)he retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages."[255] Originally mandatory in its provision,[256] the statutory provision on liquidated damages was amended in 1947 to confer discretion on the courts to deny otherwise awardable liquidated damages in whole or part when satisfied that the employer acted or omitted action "in good faith and that he had reasonable grounds for believing that his act or omission was not a violation . . . ."[257] In the instant case, the District Court so found:
 
 
 108
 (NWA) did have reasonable grounds for belief that it was not violating the Equal Pay Act. While this Court has found as fact that the jobs of purser and stewardess are in fact equal, it was not unreasonable for the Company to have believed otherwise. Five factors support this conclusion: The traditional practice of the Company in treating the positions as unequal, the general industry practice to the same effect, the acquiescence of the stewardess' bargaining representative in this arrangement, the absence of any grievances or even suggestions from stewardesses to the contrary prior to the present controversy, and the absence of any clear legal precedent or guideline precisely in point.[258]
 
 
 109
 The good faith of which the Act speaks is "an honest intention to ascertain what the . . . Act requires and to act in accordance with it."[259] That necessitates a subjective inquiry.[260] The statutory call for reasonable grounds for a belief in compliance with the Act imposes a requirement additional to good faith,[261] and one that involves an objective standard.[262] Any assessment of an employer's good faith or grounds for his belief in the legal propriety of his conduct is necessarily a finding of fact, to be disturbed on appeal only if clearly erroneous.[263] In the case at bar, however, it is clear enough that the District Court relied on factors not supportive of its conclusion. Accordingly, we must remand for redetermination of the issue.
 
 
 110
 The current version of the liquidated damages provision was enacted in response to the Supreme Court's lament in Overnight Motor Transportation v. Missel[264] of the then mandatory nature of the judicial duty respecting liquidated damages.[265] In that case, the fact that an employer was not exempt from the Fair Labor Standards Act's coverage did not plainly emerge until after the employment in question had ended. The Court expressed sympathy for the employer but concluded nevertheless:
 
 
 111
 Perplexing as (the employer's) problem may have been, the difficulty does not warrant shifting the burden to the employee. The wages were specified for him by the statute, and he was no more at fault than the employer. The liquidated damages for failure to pay the minimum wages . . . are compensation, not a penalty or punishment by the Government . . . . The retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages.[266]
 
 
 112
 Congress reacted by an amendment conferring the present discretion on the courts to limit or deny liquidated damages if the employer could meet the "substantial burden"[267] of proving that his failure to comply was in good faith and also was predicated on reasonable grounds for a belief that he was in compliance.[268] If the employer cannot convince the court in these respects, an award of liquidated damages remains mandatory;[269] and even if the employer's presentation is persuasive the court may still exercise its discretion to grant liquidated damages totally or partially.[270]
 
 
 113
 Examined against this background, the reasons given by the District Court for disallowing liquidated damages betray their legal inadequacy.[271] That an employer and others in the industry have broken the law for a long time without complaints from employees is plainly not the reasonable ground to which the statute speaks.[272] Nor is it enough that it appear that the employer probably did not act in bad faith; he must affirmatively establish that he acted both in good faith and on reasonable grounds.[273] That duty is accentuated here, where the prevalence of sex-discrimination litigation against the airline industry[274] naturally prompts the question whether NWA should reasonably have known that neither its own tradition, the industry custom nor the employees' silence was a reliable indicium of the demands of the law.[275] We need not inquire whether business custom or employee acquiescence might in particular circumstances explain why an otherwise punctilious employer did not investigate his situation more thoroughly, for in any event they do not provide a reasonable foundation for a positive belief that in fact there is compliance.
 
 
 114
 We share with the District Court the view that ambiguous or complex legal requirements may provide reasonable grounds for an employer's good faith but erroneous belief that he is in conformity with the Act.[276] Indeed, just that sort of employer-predicament was the concern of Congress when it enacted the 1947 amendments.[277] But legal uncertainty, to assist the employer's defense, must pervade and markedly influence the employer's belief; merely that the law is uncertain does not suffice. While the District Court cited the absence of precise legal guidelines as a factor indicating reasonableness on NWA's part, it made no finding that that condition actually led NWA to believe that it was in compliance with the Equal Pay Act. Furthermore, even when the court finds good faith and a reasonable basis, it retains discretion to award liquidated damages.[278] We cannot say that the District Court's decision to deny such damages would have been reached had it known that any of the five factors upon which it relied would not survive scrutiny.[279]
 
 C. Title VII Recovery Period
 
 115
 On its finding that in particular respects NWA had violated Title VII, the District Court awarded affected employees backpay[280] to remedy the pay discrimination wrought thereby,[281] but limited the recovery period to two years from the date on which charges were filed with the Equal Employment Opportunity Commission.[282] The court explained:
 
 
 116
 The Court has discretion to award back-pay to July 2, 1965,[283] but has chosen to limit that award herein. The 1972 amendment to Title VII[284] . . . limiting backpay liability to not more than two years prior to filing of charges with the (Commission)[285] is not applicable to this case. Nevertheless, it does indicate that Congress felt some limitation is appropriate to avoid "windfall" damage awards and to avoid harsh, and sometimes unbearable, economic burdens upon employers. The amendment also indicates that two years is an appropriate and reasonable period for measuring the adequacy of the remedy for the plaintiff. In light of these considerations, the court has, in the exercise of its discretion, limited the recovery period.[286]
 
 
 117
 Both sides claim error. Two issues must therefore be joined: what statute of limitations applies to pre-1972 Title VII cases, and whether within that limitation the trial judge had discretion further to restrict an award of backpay.
 
 
 118
 Preliminarily, we note that the District Court was correct in holding that the 1972 amendment inaugurating the two-year limitation on backpay liability does not apply to this case. In the amending legislation, Congress made significant changes in the Equal Employment Opportunity Commission's procedures and expressly provided that "the amendments made by this Act" to the enforcement provision of Title VII upon which the District Court's judgment rested "shall be applicable with respect to charges pending with the Commission on the date of enactment of this Act and all charges filed thereafter."[287] The irresistible inference from this language is that the amendments were not to extend to litigation which on their effective date had proceeded beyond the Commission stage. Here, on that date, the charges by Title VII claimants were no longer before the Commission, and the case was well underway in the courts,[288] and thus was not affected by the new two-year provision.[289]
 
 
 119
 Even so, both sides have argued from the 1972 amendments in favor of their respective positions on the proper limitation period for pre-1972 cases.[290] Quite apart from the canon that the meaning of legislation cannot be altered by remarks subsequent to its passage,[291] we must construe Title VII on the assumption that Congress did not intend in 1964 to limit liability by later amendment. Thus the employee-parties' contention that backpay may be awarded back to the effective date of the Act[292] seems superficially plausible now that the amendments have limited liability measured in that manner to seven years.[293] Absent the amendments, however, such a novel interpretation would have subjected NWA to a potentially unlimited backpay liability. This is not to suggest that Congress considered and put aside such a construction; rather, "the fact that such matters would require thought" leads us ultimately to reject it.[294]
 
 
 120
 Seen in this light, the problem at this point is simply that of fashioning a federal common law period of limitations.[295] Most often this is effected by adopting the period prescribed by the most analogous state statute.[296] Because of its convenience, and of the notice it presumably affords prospective litigants,[297] adoption of the state limitation period is proscribed only when it would create important conflicts with the federal policy underlying the cause of action,[298] or when it would amount to discriminatory restriction of a federal right of action.[299] Neither of those conditions exists here. While adoption of relatively short[300] state periods will prevent the fullest possible realization of the compensatory aims of Title VII, such is the inevitable result of any time bar to recovery. Neither the Supreme Court[301] nor this circuit[302] has regarded actions based on civil rights statutes as of such a special nature that recourse to state limitation periods is impermissible, and indeed, as the Supreme Court noted recently,[303] such a result may be required by federal statute.[304] Nothing about Title VII serves to distinguish it from those statutes; indeed, other circuits have invoked state rules to govern Title VII litigation.[305] On remand, the District Court must determine the local statute of limitations most appropriate to this case,[306] and its provisions will serve as the outermost limit on awards of Title VII backpay.
 
 
 121
 The question, then, is whether the trial judge has discretion to shorten, within the statutory limits, the recovery period and, if so, whether it was properly exercised in this case. Unquestionably, the judge has discretion as to whether to award backpay, but that discretion is limited to exercises faithful to the goals of Title VII. Recently in Albemarle Paper Co. v. Moody,[307] the Supreme Court, called upon to clarify this discretionary power, noted that the "District Court's decision must therefore be measured against the purposes which inform Title VII."[308] After observing that Congress patterned the backpay provision after a comparable provision in the National Labor Relations Act, and that Congress presumably was aware that backpay thereunder had been administratively awarded as a matter of course,[309] the Court held that "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."[310] The presumption in favor of backpay is thus clear, and any denial must be well supported.[311]
 
 
 122
 While no court seems to have explicitly addressed the question whether there is power to limit as well as deny backpay, we believe the power exists. Justice Marshall, in his concurring opinion in Albemarle, assumed its existence; while expressing doubt that prejudice from a delayed request for backpay could be proved, he observed that even if it were shown that an earlier backpay claim would have inspired an "exercise (of) unusual zeal" in litigating the case, that would justify only a reduction in the award of backpay to reflect the earlier date at which the court would have awarded it.[312] Such power would also appear to be inherent in the "broad latitude" given district courts in fashioning relief.[313] As Justice Rehnquist stated in his concurring opinion in Albemarle,
 
 
 123
 (i)f the award of backpay is indeed governed by equitable considerations, and not simply a thinly disguised form of damages, factors such as (reasonableness of delay and prejudice resulting), which may argue in favor of or against the equities of either plaintiff or defendants, must be open for consideration by the District Court. . . .[314]
 
 
 124
 (T)he backpay remedy provided by Title VII is modeled on the remedial provisions of the NLRA. This Court spoke to the breadth of the latter provision in Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 198, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), when it said: "(W)e must avoid the rigidities of an either-or rule. The remedy of backpay, it must be remembered, is entrusted to the Board's discretion; it is not mechanistically compelled by the Act. And in applying its authority over backpay orders, the Board has not used stereotyped formulas but has availed itself of the freedom given it by Congress under the Act to obtain just results in diverse, complicated situations."[315]
 
 
 125
 Nevertheless, the power to limit backpay is subject to restraints. As a partial denial of backpay, authority to limit must be as narrowly constrained as authority to totally deny; its exercise, therefore, must be supported by reasons faithful to the dual purpose attributed to the backpay remedy by the Albemarle Court. Firstly, a "reasonably certain prospect of a backpay award 'provide(s) the spur or catalyst which causes employers and unions to self-examine and self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.' "[316] Secondly, backpay "make(s) persons whole for injuries suffered on account of unlawful employment discrimination."[317]
 
 
 126
 By these standards, we deem the reasons given by the District Court inadequate. The fact that Congress decided to limit the recovery period for future backpay actions is not a sound basis for limiting the period in this action, for Congress deliberately chose not to apply the limitation to cases already in the courts.[318] Moreover, this generalized reason does not reflect consideration of the particular circumstances of the case. And while the court's second statement that the two-year period appropriately measures the backpay recovery here may indicate a focus on the equities of this case, it is not sufficiently detailed to permit competent review.[319] We are mindful of Albemarle's admonition that
 
 
 127
 the courts of appeals must maintain a consistent and principled application of the backpay provision, consonant with the twin statutory objectives, while at the same time recognizing that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases.[320]
 
 
 128
 Accordingly, we remand to allow the District Court to reconsider, in light of Albemarle and this opinion, the need to limit the backpay remedy here.[321]D. The Title VII Class
 
 
 129
 NWA next contends that the District Court erred in granting relief pursuant to Title VII in the form of backpay to stewardesses whose employment with the company terminated more than ninety days prior to the first filing by an employee of an unlawful-employment-practice charge with the Equal Employment Opportunity Commission. The relevant provision of Title VII[322] specifies, as a precondition to a later action in court, that "(a) charge . . . shall be filed (with the Commission) within ninety days after the alleged unlawful employment practice occurred."[323] It now appears settled that not all members of an employee class need file charges with the Commission in order to share in a recovery of backpay;[324] the purposes of the filing requirement to give notice to the charged party and enable the Commission to conciliate are adequately served by a timely filing by any member of the class.[325]
 
 
 130
 That filing, it seems clear, however, cannot revive claims which are no longer viable at the time of the filing.[326] Any other result would produce an anomaly. Time-barred members could not press their claims individually either before the Commission or judicial tribunals; and surely the employer's liability to them cannot be made to depend upon whether they come into court in a different character. True it is that class actions are liberally permitted in the federal courts,[327] but that procedural device cannot be used to expand substantive rights.[328] Not surprisingly, then, courts which have considered the question directly have uniformly held that only those employees who could have filed charges with the Commission individually when the class filing was made are properly members of the litigating class.[329]
 
 
 131
 It is contended, however, in support of the District Court's inclusion of the disputed class members within its Title VII award, that the Title VII violations complained of were of a continuing nature and thus that all past and present stewardesses could have made timely filings with the Commission when the filing for the class occurred. The District Court concluded that each of the violations was indeed continuing and that none was barred by the ninety-day provision.[330] We agree that where, as here, discrimination is not limited to isolated incidents but pervades a series or pattern of events which continue to within ninety days of the filing of the charge with the Commission, the filing is timely as to all similarly situated employees regardless of when the first discriminatory incident occurred.[331]
 
 
 132
 NWA does not dispute that the violations here are of a continuing kind. But NWA does contend that the discrimination could not be deemed continuing as to those who left the company's employ more than ninety days prior to the class filing with the Commission. We are in agreement with NWA on that score. A severing of the employment relationship ordinarily terminates a discrimination against the severed employee, and activates the time period for filing charges with the Commission concerning any violation which occurred at separation or which may have been continuing up to the date thereof.[332] To hold otherwise would effectively read the timely-filing requirement out of the statute.[333]
 
 
 133
 It is said, however, that NWA is estopped from asserting that employees terminated more than ninety days before the class filing should be excluded from the class recovery because the company was not timely in raising the issue and its untimeliness has prejudiced some individuals within the class. During the course of the proceeding, the District Court ordered class notices to be mailed to all stewardesses who were then or who had been employed by NWA at any time since the effective date of Title VII.[334] The notices informed these employees that they could file consents with the clerk of the court, in which case they would become members of the classes for Equal Pay Act and Title VII relief.[335] The notices also advised that in the event that no consent was filed, the recipient "would be entitled to share in any money award which the court grants under the Civil Rights Act."[336] The employees alleged to have been prejudiced by NWA's omission to raise the issue, at the time the class was certified and the notices were mailed, are those who, if they had filed consents with the court, could have recovered under the Equal Pay Act but who did not so file.[337] Had these employees been informed that they could not recover under Title VII and that therefore their failure to file consents would preclude them from any recovery whatever, so the argument runs, they might have filed consents in order to obtain at least partial recovery of backpay pursuant to the Equal Pay Act.
 
 
 134
 If compliance with the ninety-day charge-filing requirement is jurisdictional, there can be no estoppel. Parties cannot waive subject matter jurisdiction by their conduct or confer it on the court by consent,[338] and the absence of such jurisdiction can be raised at any time.[339] On the other hand, if timely filing with the Commission is not a jurisdictional step but is to be analogized to a statute of limitations, then an estoppel might possibly arise.[340]
 
 
 135
 The courts have not been uniform in their concept of the ninety-day period. Although the Supreme Court and this court like most others have referred to the timely-filing requirement as a jurisdictional prerequisite,[341] neither has ever had occasion to focus on the question whether courts are precluded from invoking traditional equitable doctrines to modify the requirement. When the issue has been considered, most courts have concluded that equitable principles can be used to extend the time period in deserving cases.[342] Thus several circuits have held that since private settlement of claims is a major goal of Title VII and the pursuit of contractual grievance procedures furthers that goal, the time provision is tolled while an employee pursues his contractual grievance remedies.[343] Similarly, the Fifth Circuit has stated that the time limitation must sometimes be modified to further the broad remedial purposes of Title VII. It held that the ninety-day period did not start until the facts supporting the charge of discrimination would or should have been known to an employee "with a reasonably prudent regard for his rights similarly situated to the plaintiff."[344]
 
 
 136
 We need not indicate a view on specific equitable modifications which the courts have seen fit to make. But we are in accord with the principle that the time provisions of Title VII are subject to equitable modification. Nothing in the legislative history compels us to treat those provisions as jurisdictional; on the contrary, the legislative history, although very limited on the time provisions, suggests that Congress intended them to operate similarly to statutes of limitations.[345] Therefore, to modify these time provisions to serve the dictates of sound equitable considerations would not seem to be inconsistent with congressional intent.
 
 
 137
 Equally importantly, where congressional purpose is unclear, courts have traditionally resolved ambiguities in remedial statutes in favor of those whom the legislation was designed to protect.[346] As the Supreme Court has declared, procedural "technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process."[347] Indeed, only recently, in Coles v. Penny,[348] we ourselves observed that provisions in Title VII "requires an interpretation animated by the broad humanitarian and remedial purposes underlying the federal proscription of employment discrimination."[349] While we declined in Coles to determine whether Title VII's time provisions are jurisdictional or nonjurisdictional, we cited with approval cases which have permitted equitable modifications of those provisions.[350] We hold that Title VII's ninety-day provision for the filing of charges with the Commission is not a jurisdictional absolute.[351]
 
 
 138
 We now return to the question whether NWA is estopped from raising the defense of untimeliness of the filing of charges in this case. NWA conceded in the District Court that through inadvertence it had omitted to defensively plead the ninety-day provision as a statute of limitations.[352] Even now, NWA does not claim that it posed any objection on account of that provision prior to trial.[353] By the time NWA raised the issue of untimeliness, notice had already gone out to class members informing them that they need not do anything to join in any recovery which the court might order under Title VII. It is evident that some members may have been lulled into inaction on their Equal Pay Act rights in the understanding that they would share in any Title VII recovery. It would be inconsistent with the board remedial purposes of Title VII to foreclose them from recovery thereunder. We conclude, then, that while the District Court on remand must exclude from the Title VII recovery those employees whose connection with NWA was dissolved more than ninety days before the class filing with the Commission, the court must retain in the class for the Title VII recovery those employees who would have brought themselves within the Equal Pay Act class by filing consents.
 
 E. Longevity
 
 139
 The last remedy-issue raised by NWA is that the District Court erred in equating longevity with seniority for pay purposes. The court's judgment provides for (a) salaries, as prescribed in the purser pay-scale, for all female cabin attendants, "(t)he longevity of each . . . for purposes of applying the purser pay scale (to) be her system seniority,"[354] and (b) backpay for both the Equal Pay Act and the Title VII plaintiffs, calculated at "the difference between the Equal Pay Act and the Title VII plaintiffs, calculated at "the difference between the salary actually paid to her . . . and the salary . . . which would have been paid to her had she been compensated as a purser with longevity for pay purposes equal to her system seniority."[355] NWA insists that longevity and seniority are computed differently longevity as representing the days of actual service and seniority as merely reflecting the hiring date and that longevity rather than seniority fixes the appropriate step on the salary schedule. NWA's contention is not disputed. It is argued, however, that NWA should have raised the point before the judgment was entered, and not by a post-judgment motion, and that there is no evidence in the record to either support or refute NWA's position. But we must remand this case anyway, and we discern no reason why the District Court should not then afford NWA an opportunity to prove its point. Since no one was prejudiced by NWA's somewhat delayed objection, reconsideration of the matter would better serve the ends of justice. And since a quick look at the collective bargaining agreement should answer the question, no additional delay should be entailed. The remedial order in this case is to make employees whole, but not more than whole.
 
 VI. THE UNIONS
 
 140
 After entry of the District Court's judgment, NWA moved, pursuant to Civil Rule 15(b),[356] to amend its answer by inclusion of a request for realignment of the Air Line Pilots Association, International (ALPA) from a non-aligned party status to a defendant; and to assert a cross-claim demanding contribution or idemnification from ALPA for any liability NWA might have to employees under the Equal Pay Act or Title VII, and a claim for damages under the Equal Pay Act for allegedly causing NWA to violate it. NWA also moved, pursuant to Civil Rule 14(a),[357] for leave to serve a third-party complaint on the Transport Workers Union of America (TWU), seeking similar relief from that union.
 
 
 141
 At the time the instant suit began, TWU was the certified bargaining representative of NWA's cabin attendants. Later, its status as such was challenged and ALPA became the certified representative. NWA's motions were filed almost four years after the action was commenced, more than three years after NWA had answered the complaint, almost one and one-half years after trial was completed and, as previously indicated, several months after the court rendered its findings and judgment. The District Court denied both motions[358] and NWA appeals the denials.
 
 
 142
 Rule 14(a) specifies the manner in which a third party may be impleaded by a defendant.[359] If the third-party complaint is filed within ten days of the defendant's answer, leave of the court is not required, but after that the defendant must obtain leave.[360] The decision on the motion resides in the trial court's discretion and our role is to review simply for abuse or legal error.[361] The denial of the motions here clearly was neither.
 
 
 143
 Instead of effectuating the purposes of Rule 14 avoiding circuity of actions[362] a grant of the motions would have defeated that goal. To have reopened the litigation at the point NWA sought it would not only have been judicially uneconomical but would also have inflicted a hardship on the parties. NWA has established no excuse for the long delay in attempting to bring TWU into the case.[363]
 
 
 144
 NWA's effort vis-a-vis ALPA invoked Rule 15(b), which in pertinent part provides that "(w)hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."[364] Thus NWA's motion to amend its answer to incorporate a cross-claim against ALPA for contribution or indemnification and a separate claim for damages presumes that these issues were tried by implied consent of the parties. This seems manifestly to be an erroneous assumption. After ALPA was certified as exclusive bargaining representative of the cabin attendants in the stead of TWU, the employees moved to join ALPA as a party "solely for the limited purpose of assuring that the court will have before it all the parties necessary to effectuate relief,"[365] noting explicitly that they "do not contend that ALPA has in any respect violated" the law.[366] Since they deemed ALPA "not responsible for any of the discrimination"[367] alleged, they did not seek to join ALPA as a defendant. By letter to the District Court, NWA advised that it had no objection to the employees' motion, and directed ALPA to indicate how it wished to be aligned with respect to the issues. ALPA responded that it wished to proceed as a non-aligned party as it did not "possess sufficient knowledge or information to align itself on the issues,"[368] and there was no opposition to ALPA's entry as such. At the trial, which extended over a five-week period, counsel for ALPA appeared only on two days "the first day of trial, and on one other occasion at the close of the trial to indicate a potential desire to present evidence; no further appearance was made and no evidence was presented."[369]
 
 
 145
 We cannot detect in this scenario any implied consent by ALPA to litigate any issue of liability to NWA. The question whether an issue has been tried by consent is a matter committed largely to the trial court's discretion and will not be reversed except upon a showing of abuse.[370] Clearly there was no abuse here.
 
 
 146
 For the reasons articulated herein, we vacate the provisions of the District Court's judgment pertaining to the questions of good faith,[371] recovery period[372] and eligible class-members[373] arising under Title VII, and remand the case to that court for reconsideration thereof. To the extent indicated herein, other matters may appropriately be addressed to the court on remand. In all other respects, we affirm the judgment.
 
 
 147
 So ordered.
 
 
 
 [1]
 Laffey v. Northwest Airlines, 366 F.Supp. 763 (D.D.C.1973); Laffey v. Northwest Airlines, 374 F.Supp. 1382 (D.D.C.1974). See also Laffey v. Northwest Airlines, 392 F.Supp. 1076 (D.D.C.1975), an adjudication not before us on this appeal
 
 
 [2]
 Pub.L.No. 88-38, § 3, 77 Stat. 56 (1963), 29 U.S.C. § 206(d) (1970). Hereinafter we cite this legislation and in most instances other legislation by reference only to the United States Code
 
 
 [3]
 Pub.L.No. 88-352, tit. VII, § 701 et seq., 78 Stat. 253 (1964), as amended, 42 U.S.C. § 2000e et seq. (1970)
 
 
 [4]
 See Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 763-789
 
 
 [5]
 See id. at 789-790; Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1390
 
 
 [6]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1382-1390
 
 
 [7]
 Our discussion takes the following order: in Part I, the history of the employment practices in issue; in Part II, the applicable statutes; in Part III, the Equal Pay Act claims; in Part IV, the Title VII claims; in Part V, the remedial order; and in Part VI, the liability of the unions
 
 
 [8]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 765 (Find. 6)
 
 
 [9]
 Id
 
 
 [10]
 Id. This bar to access, found in violation of Title VII, Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 789 (Concl. 5), is not contested by NWA on appeal. The company challenges only the finding that the purser and stewardess jobs are intrinsically equal and thus commanding equal salaries even for those stewardesses who might not seek purser status
 
 
 [11]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 765 (Find. 6)
 
 
 [12]
 Id. at 766 (Find. 13)
 
 
 [13]
 Id. at 766-767 (Find. 14). A small number of flight service attendants in order to maintain their base location in Hawaii chose not to become pursers
 
 
 [14]
 Id. at 767-768 (Finds. 23, 24)
 
 
 [15]
 Id. at 767-768, 778-779 (Finds. 23, 45)
 
 
 [16]
 Id. at 767-769 (Finds. 23, 24). Stewardesses who bid unsuccessfully for purser positions are permitted a review of the company's action only if they have four years of service for the company "on flights to which a purser has been assigned." The probationary period for pursers has been extended from four to six months. Flight service attendants who become pursers are given credit for their entire service on the purser seniority list, while stewardesses who become pursers receive no seniority credit for their service as stewardess, and are required to go to the bottom of the purser seniority list. Because of an overlap at the upper end of the stewardess salary scale and the lower end of the purser salary scale, senior stewardesses who become pursers will not receive any greater pay as purser for a significant period of time. The District Court found that these requirements were a significant deterrent to stewardess-bidding for purser vacancies. Id. at 768-769 (Find. 24). This finding is not challenged by NWA on appeal
 
 
 [17]
 Id. at 769 (Find. 27)
 
 
 [18]
 Id. (Find. 28)
 
 
 [19]
 Id. at 773 (Find. 38). These statistics changed significantly after suit was filed, when NWA began to diversify male-female ratios in different occupations. Some men were placed in the lower-paid categories by demoting pursers and by hiring new male applicants as "stewards" who were paid at the stewardess rate. Id. at 767, 770-771 (Finds. 20, 35)
 
 
 [20]
 Id. at 769-770 (Find. 29)
 
 
 [21]
 Id. at 770 (Find. 30)
 
 
 [22]
 Id
 
 
 [23]
 Id. (Finds. 31, 33). A pay decrease for progression from stewardess to purser had been specifically prohibited by the 1967 collective bargaining agreement, which provided:
 No reduction in pay shall be suffered by an employee by virtue of his accepting a purser assignment.
 NWA eventually acquiesced and paid Ms. Laffey her stewardess salary rate. Id. (Find. 33).
 
 
 [24]
 NWA does not contest the conclusions following:
 
 
 [3]
 Northwest Airlines, Inc. has discriminated on the basis of sex in willful violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), 29 U.S.C. § 255(a), by paying Mary P. Laffey a lower salary as a purser than it pays to male pursers with equivalent length of cabin attendant service
 
 
 [5]
 Northwest Airlines, Inc. has violated Title VII:
 (a) By discriminating against females because of their sex in filling purser vacancies from July 2, 1965 to date.
 (b) By providing from June 16, 1967 to date that stewardesses who become pursers do not get credit for their stewardess seniority on the purser seniority list, where as male FSA's who have become pursers (both before and after June 15, 1967), get credit for FSA seniority on the purser list. . . .
 (d) By providing that stewardesses who become pursers are slotted at the bottom of the purser pay scale and thus receive lower salaries than male pursers with equal cabin attendant longevity, thus perpetuating the effects of past discrimination from June 15, 1967 to date.
 (e) By changing its procedures and standards for selecting pursers, lengthening the probationary period, denying consideration of purser bids to stewardesses who have not flown with a purser for four years, according automatic preference to junior pursers over senior stewardesses in bidding for purser vacancies, discouraging and attempting to deter stewardesses from bidding on purser vacancies, failing to post notices of all purser vacancies at all cabin attendants bases, from June 15, 1967 to date.
 (f) By demoting Mary P. Laffey from purser to stewardess and continuing her as a stewardess, by paying her a lower salary as a purser than it paid male pursers hired as cabin attendants subsequent to her, thus perpetuating the effects of past discrimination.
 (g) By imposing a "chain of command" aboard planes under which all male cabin attendants, irrespective of classification or length of service were superior to all female cabin attendants.
 (h) By forbidding only female cabin attendants to wear eyeglasses, . . ., to have free choice of luggage, . . . and by imposing a shorter maximum height requirement for female cabin attendants.
 Id. at 789-790 (Concls. 3, 5).
 
 
 [25]
 Id. at 788 (Find. 80)
 
 
 [26]
 The relevant portion thereof is quoted at text infra at note 90
 
 
 [27]
 We discuss this prohibition, and exceptions thereto, in Part III, infra
 
 
 [28]
 The relevant portion thereof is quoted at text infra at note 91
 
 
 [29]
 Discussed in Part IV, infra
 
 
 [30]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 775-776 (Find. 40)
 
 
 [31]
 Id
 
 
 [32]
 Id
 
 
 [33]
 Id
 
 
 [34]
 At times, NWA has chosen to utilize pursers on domestic flights. Id. at 775-778 (Finds. 40, 41)
 
 
 [35]
 Id. at 776-778 (Find. 41)
 
 
 [36]
 Id
 
 
 [37]
 Id. at 778 (Find. 44)
 
 
 [38]
 Id. at 778 (Find. 42)
 
 
 [39]
 Id. (Finds. 42, 43)
 
 
 [40]
 Id. at 775-778 (Finds. 40-78)
 
 
 [41]
 Id. at 779 (Finds. 49, 50)
 
 
 [42]
 Id. (Find. 50)
 
 
 [43]
 Id. at 779-780 (Find. 51)
 
 
 [44]
 Id
 
 
 [45]
 Id. at 780 (Find. 52)
 
 
 [46]
 Id
 
 
 [47]
 Id. at 781 (Find. 57)
 
 
 [48]
 Id. (Find. 53)
 
 
 [49]
 Id. at 786-787 (Find. 71)
 
 
 [50]
 Id. at 787 (Find. 73)
 
 
 [51]
 Id. On military air charter flights, all phases of work done by pursers is less demanding than on other flights. There is no class-service, no liquor, and only very simple food service
 
 
 [52]
 Id
 
 
 [53]
 Id. at 787-788 (Find. 75)
 
 
 [54]
 Id
 
 
 [55]
 Id. at 781-785 (Finds. 58-64)
 
 
 [56]
 Id. at 781 (Find. 58). Liquor is provided free of charge in the first-class compartment, where the pursers work. Hence pursers must only complete a beverage-use form
 
 
 [57]
 Id
 
 
 [58]
 Id
 
 
 [59]
 The log contains a listing of cabin items in need of repair
 
 
 [60]
 See the listing in Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 781-782 (Find. 59). There are also various other forms which the senior cabin attendant is required to complete. For example, on flights from mainland United States to Hawaii, the senior cabin attendant, who almost always is a stewardess, must instruct passengers in the completion of an agricultural declaration form, spray the cabin with insecticides and record this information on a "certificate of disinsectization". Only stewardesses and flight service attendants have been regularly scheduled on these flights. On flights between the United States and Winnipeg, stewardesses must oversee completion of Canadian and United States customs forms. The senior cabin attendant also has direct personal responsibility for the safe transfer of passage aliens who transit through the United States without visas, under permission from the Immigration Service the so-called "TRWOV" passengers. Id. at 782 (Find. 60)
 
 
 [61]
 Id. at 783 (Find. 61)
 
 
 [62]
 Id
 
 
 [63]
 Id. at 784 (Find. 62). On east-bound segments of domestic flights, pursers need only transport the pouch containing the documents and deliver it to another company transportation agent upon arrival at the aircraft's destination. On west-bound portions of domestic segments of flights from the United States to Tokyo and on interport flights, the documentation duties are more substantial
 
 
 [64]
 Id. at 784-785 (Find. 63)
 
 
 [65]
 Id. at 785 (Find. 64)
 
 
 [66]
 Id. (Finds. 65-66)
 
 
 [67]
 Id. (Find. 66)
 
 
 [68]
 Id. at 785-786 (Find. 67)
 
 
 [69]
 Id. at 786 (Find. 68)
 
 
 [70]
 Id. at 785-786 (Find. 67)
 
 
 [71]
 Id
 
 
 [72]
 Id. at 786 (Find. 69)
 
 
 [73]
 Id. NWA has consistently refused to pay stewardesses acting as senior cabin attendants any supplement for their services. Id. (Find. 70)
 
 
 [74]
 Id. (Find. 69)
 
 
 [75]
 Id. at 789 (Concls. 2, 4)
 
 
 [76]
 Id. (Concl. 2)
 
 
 [77]
 29 U.S.C. § 206(d)(1), 29 U.S.C. § 255(a)
 
 
 [78]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 789 (Concls. 2, 3). Conclusion of Law No. 3, referring specifically to Ms. Laffey, was not appealed by NWA. See note 24 supra
 
 
 [79]
 42 U.S.C. § 2000e-2(a)
 
 
 [80]
 See text supra at note 14
 
 
 [81]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 780-790 (Concl. 5). Many of these are not challenged by NWA on appeal
 
 
 [82]
 See Parts III, IV infra
 
 
 [83]
 See Parts III, IV infra
 
 
 [84]
 See Parts III, IV infra
 
 
 [85]
 See Part IV infra
 
 
 [86]
 See Part V infra
 
 
 [87]
 Pub.L. No. 88-38, § 3, 77 Stat. 56 (1963)
 
 
 [88]
 Act of June 25, 1938, ch. 676, 52 Stat. 1060, as amended, 29 U.S.C. §§ 201 et seq. (1970)
 
 
 [89]
 NWA employees are unquestionably within the coverage of the Equal Pay Act
 
 
 [90]
 29 U.S.C. § 206(d)(1) (1970)
 
 
 [91]
 42 U.S.C. § 2000e-2(a)(1)
 
 
 [92]
 See 29 U.S.C. § 216(b) (1970)
 
 
 [93]
 See text supra at note 91
 
 
 [94]
 See Part I supra
 
 
 [95]
 See generally, Herbert & Reischel, Title VII and the Multiple Approaches to Eliminating Employment Discrimination, 46 N.Y.U.L.Rev. 449 (1971)
 
 
 [96]
 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)
 
 
 [97]
 Id. at 49, 94 S.Ct. at 1020, 39 L.Ed.2d at 158-159
 
 
 [98]
 Id. at 48, 94 S.Ct. at 1019-1020, 39 L.Ed.2d at 158
 
 
 [99]
 See 110 Cong.Rec. 13650-13652 (1964)
 
 
 [100]
 Shultz v. Wheaton Glass Co., 421 F.2d 259, 266 (3d Cir.), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). See also Ammons v. Zia Co., 448 F.2d 117, 119 (9th Cir. 1971) ("both (the Civil Rights Act and the Equal Pay Act) 'serve the same fundamental purpose' . . .."); Hodgson v. Brookhaven Gen. Hosp., 436 F.2d 719, 727 (5th Cir. 1970)
 
 
 [101]
 511 F.2d 166 (5th Cir.), cert. denied, 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975)
 
 
 [102]
 Id. at 170-171. See also Piva v. Xerox Corp., 376 F.Supp. 242, 246-247 (N.D.Cal.1974)
 
 
 [103]
 See text supra at note 91
 
 
 [104]
 42 U.S.C. § 2000e-2(h) (1970) specifies that
 . . . it shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of (the Equal Pay Act).
 The exceptions to the Equal Pay Act, by virtue of which unequal salaries may be legally permissible are explicitly set forth in the statute, 29 U.S.C. § 206(d)(1)(i)-(iv) (1970). See text supra at note 90.
 
 
 [105]
 Cf. Hodgson v. Brookhaven Gen. Hosp., supra note 100, 436 F.2d at 724. See also Brennan v. Prince William Hosp. Corp., 503 F.2d 282, 288 (4th Cir. 1974), cert. denied, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975)
 
 
 [106]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 765 (Find. 7)
 
 
 [107]
 Id. at 767-768 (Find. 23)
 
 
 [108]
 Id. at 778-779 (Find. 45)
 
 
 [109]
 Robinson v. Lorillard Corp., 444 F.2d 791, 799, 21 A.L.R.Fed. 453 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). See also United States v. Bethlehem Steel Corp., 312 F.Supp. 977, 989-991 (W.D.N.Y.1970), rev'd in part on other grounds, 446 F.2d 652 (2d Cir. 1971)
 
 
 [110]
 See text supra at note 108
 
 
 [111]
 In Corning Glass Works v. Brennan, 417 U.S. 188, 208-210, 94 S.Ct. 2223, 2234-2235, 41 L.Ed.2d 1, 17-18 (1974), the Supreme Court rejected the company's contention that it cured its violation of the Act caused by paying different wages to day and night inspectors, a masking of a wage system originally based on sex when a new collective bargaining agreement went into effect. The new agreement provided for equalization of base wages for newly-hired night and day inspectors but continued to provide unequal base wages for employees hired before its operative date. The Court reasoned that the lower base wage for day inspectors was a "direct product" of the unlawful failure to equalize base wages for male and female employees as of the effective date of the Act. If the company had properly equalized the wage rates on that date, employees hired prior to the new agreement would have received the higher rate. Since the collective bargaining agreement "operated to perpetuate the effects of the company's prior illegal practice of paying women less than men for equal work," it provided no defense to infringement of the Act. Id. at 209-210, 94 S.Ct. at 2235, 41 L.Ed.2d at 18
 
 
 [112]
 See Macklin v. Spector Freight Sys., Inc., 156 U.S.App.D.C. 69, 78-79, 478 F.2d 979, 988-989 (1973), disapproved on other grounds, Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); Hodgson v. Sagner, Inc., 326 F.Supp. 371 (D.Md.1971), aff'd, 462 F.2d 180 (4th Cir. 1972)
 Under the Fair Labor Standards Act, no agreement between a company and a union, even if arrived at as a result of collective bargaining negotiations, can be used as a defense by a company to the statutory requirements.
 Hodgson v. Sagner, Inc., supra, 326 F.Supp. at 375.
 
 
 [113]
 Shultz v. Wheaton Glass Co., supra note 100, 421 F.2d at 265
 
 
 [114]
 Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 195, 94 S.Ct. at 2228, 41 L.Ed.2d at 10 (emphasis added)
 
 
 [115]
 See text supra at note 90
 
 
 [116]
 See 109 Cong.Rec. 9196 (1963) (remarks of Representative Frelinghuysen); id. at 9208 (remarks of Representative Goodell); Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 195, 94 S.Ct. at 2228, 41 L.Ed.2d at 10; Hodgson v. Fairmont Supply Co., 454 F.2d 490, 493 (4th Cir. 1972); Hodgson v. Brookhaven Gen. Hosp., supra note 100, 436 F.2d at 722; Shultz v. American Can Co.-Dixie Prods., 424 F.2d 356, 360 (8th Cir. 1970)
 
 
 [117]
 See text supra at note 90
 
 
 [118]
 Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 196, 94 S.Ct. at 2229, 41 L.Ed.2d at 11; Hodgson v. Robert Hall Clothes, Inc., 473 F.2d 589, 596 (3d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 50, 38 L.Ed.2d 85 (1973); Shultz v. Wheaton Glass Co., supra note 100, 421 F.2d at 266; Shultz v. First Victoria Nat'l Bank, 420 F.2d 648, 654 n. 8, 7 A.L.R. Fed. 691 (6th Cir. 1969); Shultz v. American Can Co.-Dixie Prods., supra note 116, 424 F.2d at 362
 
 
 [119]
 See A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095, 1098-1099 (1945); Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393, 396-397 (1960); Walling v. General Indus. Co., 330 U.S. 545, 547-548, 67 S.Ct. 883-884, 91 L.Ed. 1088, 1090-1091 (1947); Mitchell v. Kentucky Fin. Co., 359 U.S. 290, 295, 79 S.Ct. 756, 759, 3 L.Ed.2d 815, 819 (1959), all cited in Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 197, n. 12, 94 S.Ct. at 2229, n. 12, 41 L.Ed.2d at 11 n. 12
 
 
 [120]
 Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 203 n. 24, 94 S.Ct. at 2232 n. 24, 41 L.Ed.2d at 15 n. 12
 
 
 [121]
 See, e. g., Hodgson v. Fairmont Supply Co., supra note 116, 454 F.2d at 493, citing Shultz v. Wheaton Glass Co., supra note 100, 421 F.2d at 265; Hodgson v. American Bank of Commerce, 447 F.2d 416 (5th Cir. 1971)
 
 
 [122]
 See Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 285
 
 
 [123]
 29 C.F.R. §§ 800.114-800.166 (1975)
 
 
 [124]
 29 C.F.R. § 800.121 (1975)
 
 
 [125]
 29 C.F.R. § 800.120 (1975). See 109 Cong.Rec. 9196 (1963) (remarks of Representative Frelinghuysen); id. at 9208 (remarks of Representative Goodell); id. at 9761 (remarks of Senator McNamara)
 
 
 [126]
 29 C.F.R. § 800.122 (1975)
 
 
 [127]
 See Hodgson v. Corning Glass Works, 474 F.2d 226, 232 (2d Cir. 1973); aff'd, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 287-288 n. 5; Brennan v. City Stores, Inc., 479 F.2d 235, 239-240 (5th Cir. 1973). See also National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 282, 443 F.2d 689, 702 (1971)
 
 
 [128]
 See, e. g., Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 290
 
 
 [129]
 29 C.F.R. §§ 800.126, 800.130(c) (1975). See, e. g., Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 290-291; Hodgson v. American Bank of Commerce, supra note 121, 447 F.2d at 421-423; Hodgson v. Brookhaven Gen. Hosp., supra note 100, 436 F.2d at 724-726
 
 
 [130]
 See, e. g., Hodgson v. Brookhaven Gen. Hosp., supra note 100 ("orderlies" and "nurses aides")
 
 
 [131]
 29 C.F.R. § 800.122 (1975)
 
 
 [132]
 29 C.F.R. §§ 800.143, 1604(a)(1)(i) (1975)
 
 
 [133]
 Id. § 800.148. See also Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1046-1047 (5th Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973); Hodgson v. Security Nat'l Bank, 460 F.2d 57, 60-61 (8th Cir. 1972) (reversing a lower court decision which ruled that a male-dominated bank management training program was bona fide); Hodgson v. Fairmont Supply Co., supra note 116, 454 F.2d at 498-499 (reversing a District Court finding which had upheld a sex-based sales training program); Shultz v. First Victoria Nat'l Bank, supra note 118, 420 F.2d at 655-657 (male-dominated "executive training programs" for bank tellers did not constitute a factor "other than sex" which would permit a pay differential where female tellers were never included in the training program)
 
 
 [134]
 Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 285-286. See also, Shultz v. Wheaton Glass Co., supra note 100, 421 F.2d at 265; Hodgson v. Brookhaven Gen. Hosp., supra note 100, 436 F.2d at 723 n. 3; Hodgson v. American Bank of Commerce, supra note 121, 447 F.2d at 422-423; Shultz v. First Victoria Nat'l Bank, supra note 118, 420 F.2d at 655
 
 
 [135]
 Shultz v. Wheaton Glass Co., supra note 100, 421 F.2d at 263-264; Hodgson v. Fairmont Supply Co., supra note 116, 454 F.2d at 493; Hodgson v. Behrens Drug Co., supra note 132, 475 F.2d at 1047; Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 285-286; Hodgson v. Miller Brewing Co., 457 F.2d 221, 225 n. 8 (7th Cir. 1972); Shultz v. American Can Co.-Dixie Prods., supra note 116, 424 F.2d at 360-362
 
 
 [136]
 See Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 288; Hodgson v. Behrens Drug Co., supra note 132, 475 F.2d at 1047; Hodgson v. Montana State Bd. of Educ., 336 F.Supp. 524, 525 (D.Mont.1972)
 
 
 [137]
 Shultz v. American Can Co.-Dixie Prods., supra note 116, 424 F.2d at 360-361
 
 
 [138]
 Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 286, citing Shultz v. Wheaton Glass Co., supra note 100
 
 
 [139]
 Brennan v. Prince William Hosp. Corp., supra note 105, 503 F.2d at 286, citing Brennan v. City Stores, Inc., supra note 127, 479 F.2d at 241 n. 12 and Hodgson v. Brookhaven Gen. Hosp., supra note 100, 436 F.2d at 726
 
 
 [140]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 784-787 (Finds. 62, 63, 70-73)
 
 
 [141]
 Id. at 788 (Find. 80)
 
 
 [142]
 Id. at 776-777, 787-789 (Finds. 41, 72, 78-81)
 
 
 [143]
 Id. at 786 (Find. 70)
 
 
 [144]
 Id. (Find. 68)
 
 
 [145]
 Id
 
 
 [146]
 Id. at 787 (Find. 73)
 
 
 [147]
 Id. at 786-787 (Find. 71)
 
 
 [148]
 Id. at 787 (Find. 72)
 
 
 [149]
 Id. at 788 (Find. 80)
 
 
 [150]
 See text supra at notes 113-114
 
 
 [151]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 788-789 (Find. 81)
 
 
 [152]
 Id
 
 
 [153]
 It is argued that pursers are salaried higher because they must function under more onerous working conditions in that they are confined to a more restricted bidding schedule and are assigned to more foreign flights. However, stewardesses with foreign language proficiency are confined to an even more restricted bidding schedule and yet they are paid at the rate applicable to other stewardesses. Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 778 (Find. 44). And foreign flying stewardesses are assigned to more foreign flights but receive only the same flying supplement that all stewardesses get for any foreign flying. Id. Moreover, pursers realize substantially higher pay than do stewardesses engaged in foreign flying. Therefore, NWA cannot justify the increased purser-pay on the basis of more restricted bidding schedules or more extensive foreign flying since stewardesses subjected to these same circumstances are nevertheless paid considerably less
 More importantly, NWA cannot support the higher pay on the ground that pursers and stewardesses perform their jobs under different working conditions. In Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 202-203, 94 S.Ct. at 2231-2232, 41 L.Ed.2d at 14-15, the Supreme Court defined "working conditions" as a term having a "different and much more specific meaning" than "a layman might . . . assume." Only "surroundings" such as toxic chemicals or fumes regularly encountered by a worker and "hazards" such as those which pose the risk of severe physical injury are encompassed within the meaning of "working conditions." The District Court's finding that stewardesses and pursers perform under similar working conditions is thus amply supported in the record.
 NWA also asserts on appeal that even if the District Court was correct in holding that the jobs of stewardess and purser are equal, at least part of the compensation received by pursers falls within an exception to the Act as payment made pursuant to "a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv) (1970). NWA contends that one factor other than sex is foreign flying; it points out that since stewardesses on foreign flights get a foreign flying supplement, at least that portion of purser salary rests on a factor other than sex. The counter-argument advanced is that the exception to the Act is an affirmative defense which NWA has waived because it was never pleaded. We need not resolve this issue, however, since even if NWA properly raised the defense, it has not shouldered its burden of proving it.
 The District Court implicitly found that the purser salary is not based on foreign flying, when it found that a "substantial percentage of the Company's overall utilization of pursers consisted of their assignment to pure domestic flights or to the domestic segments of international flights," Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 787 (Find. 73), and that pursers received the same pay regardless of whether they were engaged in foreign flying. Id., at 788-789 (Find. 81). Consequently, NWA did not sustain its burden of proving that part of the purser salary was intended as compensation for foreign flying and was not "an added payment based on sex." Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 204, 94 S.Ct. at 2233, 41 L.Ed.2d at 15.
 
 
 [154]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 786 (Find. 69)
 
 
 [155]
 29 C.F.R. § 800.129 (1975), and note the examples, id. at § 800.130
 
 
 [156]
 Hodgson v. American Bank of Commerce, supra note 121, 447 F.2d at 422
 
 
 [157]
 Id
 
 
 [158]
 Once the stewardess position is found to be equal work to that of purser, not only must access to the job of purser be granted to women, but women who remain stewardesses must also be given pay equal to pursers'. The wage rates for male employees cannot be reduced to achieve equality, because the proviso to 29 U.S.C. § 206(d)(1) insures that in fashioning a remedy, "an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 29 U.S.C. § 206(d)(1) (1970)
 
 
 [159]
 See text supra at note 91
 
 
 [160]
 See text supra at note 91
 
 
 [161]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 789 (Concl. 4)
 
 
 [162]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1386-1387
 
 
 [163]
 See Part V infra
 
 
 [164]
 Many of these policies have been changed since this litigation was instituted
 
 
 [165]
 See note 175 infra
 
 
 [166]
 See text supra at note 91 and note 175 infra
 
 
 [167]
 See text supra at note 91
 
 
 [168]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 773-774 (Find. 39)
 
 
 [169]
 Id
 
 
 [170]
 Other company policies found violative of stewardesses' statutory rights by rulings not contested on appeal prohibited them from wearing eyeglasses, required them to purchase prescribed luggage, and imposed on them a shorter height limitation. Id. at 790 (Concl. 5(h)). See note 24 supra
 
 
 [171]
 In reference to Title VII's enforcement provisions, § 706(g), 42 U.S.C. § 2000e-5(g) (1970), which authorizes legal and equitable relief against an employer "intentionally" engaging in an unlawful employment practice,
 (i)n determining the meaning of "intentional," resort must be had almost entirely to legislative history. In its original form, 706(g) contained no such requirement; it was amended by Senator Dirksen's proposal, probably in response to opposition pressure. The first draft of the amendment contained the word "willfully" instead of "intentionally"; interpretative material was introduced into the record by Senator Dirksen:
 The words "willful and willfully" as ordinarily employed, mean nothing more than that the person, of whose actions or default the expressions are used, knows what he is doing, intends what he is doing, and is a free agent. * * *
 The terms are also employed to denote an intentional act * * * as distinguished from an accidental act * * *
 This is precisely the situation which might exist if the words are not added. * * * Accidental, inadvertent, heedless, unintended acts could subject an employer to charges under the present language.
 For reasons that are not apparent, this version was not enacted, and not until some time later was the amendment with the present language passed. The only significant difference between the two versions is the substitution of "intentionally" for "willfully" and there is no indication that any strengthening of the requirement was meant. It may be concluded that the Dirksen Amendment does not greatly narrow the coverage of section 706(g).
 Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 995-996 n.15 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), quoting Note, Legal Implications of the Use of Standardized Ability Tests in Employment and Education, 68 Colum.L.Rev. 691, 713 (1968). See also cases cited infra note 174.
 
 
 [172]
 Local 189, United Papermakers & Paperworkers v. United States, supra note 171, 416 F.2d at 995-997
 
 
 [173]
 Id. at 996
 
 
 [174]
 "Title VII is not concerned with the employer's 'good intent or absence of discriminatory intent' for 'Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation.' " Albemarle Paper Co. v. Moody, 422 U.S. 405, 422, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280, 299 (1975), quoting Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 165 (1971) (emphasis in original). See, e. g., Sabala v. Western Gillette, Inc., 516 F.2d 1251, 1259 (5th Cir. 1975); Frobig v. Held Warehouse and Transp. Corp., 8 F.E.P. Cas. 926, 929-930 (E.D.N.Y.1974) ("(t) here is . . . no necessity that (payment of lower wages to female as opposed to male employees) be found to be based on any calculated denigration of women or women's work as distinguished from the simple, conscious paying of a lower rate of pay to women doing equal work than the rate paid to men doing the same work in the same pay periods")
 
 
 [175]
 NWA also challenges the District Court's determination that the furnishing on layovers of single rooms to male employees and only double rooms to female employees also violates the Equal Pay Act. Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 789 (Concl. 2). The company contends that lodging does not constitute wages within the meaning of the Act because regulations promulgated thereunder indicate that "payments made by an employer to an employee which do not constitute remuneration for employment are not 'wages' to be compared for equal pay purposes under" 29 U.S.C. § 206(d)(1) (1970). 29 C.F.R. § 800.110 (1975). Examples given of payments which are not deemed remuneration are those for maternity and "such reimbursable expenses of traveling on the employer's business as are discussed in (29 C.F.R.) § 778.217." The regulation cited provides in part that "(w)here an employee incurs expenses on his employer's behalf or where he is required to expend sums solely by reason of action taken for the convenience of his employer, . . . (p)ayments made by the employer to cover such expenses are not included in the employee's regular rate. . . . Such payment is not compensation for services rendered by the employee during any hours worked in the workweek."
 However, NWA ignores other provisions of the Fair Labor Standards Act and of other regulations formulated under the Equal Pay Act. Specifically, 29 U.S.C. § 203(m) provides in part that " '(w)age' paid to any employee includes the reasonable cost . . . to the employer of furnishing such employee with board, lodging or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." And a regulation implementing the Equal Pay Act specifies that "(t)he reasonable cost or fair value of certain prerequisites, as provided in (29 U.S.C. § 203(m)) . . . is, by definition, a part of the wage paid to an employee for purposes of the Act." 29 C.F.R. § 800.112 (1975).
 It is thus clear that where, as here, the employer customarily furnishes lodging for the employees, as opposed to merely reimbursing them for expenditures made for lodging not regularly supplied, the cost thereof constitutes wages under the Equal Pay Act. Though not entirely manifest from the District Court's finding, Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 774 (Find. 39), both sides make it clear that the company's payments were made directly to the hotels and not to the employees as reimbursement. Accordingly, the District Court was correct in holding that the provision of less expensive and less desirable lay-over accommodations to female employees than were provided to male employees is in derogation of the Equal Pay Act.
 
 
 [176]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 790 (Concl. 5(h))
 
 
 [177]
 Id. at 773-774 (Find. 30)
 
 
 [178]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1387-1388
 
 
 [179]
 Id
 
 
 [180]
 Id. at 1387. The company was also ordered to notify all female cabin attendants that the weight requirements and their agreements to adhere thereto would no longer be enforced, and to remove from the cabin service manual any mention of weight requirements beyond such as would render a person "physically incapable of performing the duties of the job." Id. In addition, reinstatement and back pay were ordered for those who had been terminated or grounded on account of weight, and the company was directed to excise from personnel records indication of reprimands arising from noncompliance with those restrictions. Id. at 1387-1388
 
 
 [181]
 NWA does not challenge the District Court's conclusion that it discriminated against stewardesses through the use of the weight restrictions. Nor does NWA contest the District Court's order that NWA offer immediate reinstatement to each stewardess suspended or terminated as a result of being overweight. However, the company does attack that part of the court's order which requires it to grant backpay to stewardesses who could not have filed timely charges with the Equal Employment Opportunity Commission on the date that the first filing with the Commission was made by a class member. We consider that issue in Part V(D) infra
 
 
 [182]
 Retaliation, it is said, takes the form of pitting male employees against female employees in anger over the latter's having precipitated an unwanted condition covering men. It is claimed that if new restrictions are permitted against all employees, the stewardesses' victory is hollow since they would have won only an expansion of the scope of the old restrictions rather than any alleviation thereof for themselves. Because this claim has not been fully litigated as a factual matter in the District Court, we intimate no view on it
 
 
 [183]
 Supra note 174
 
 
 [184]
 Griggs v. Duke Power Co., supra note 174, 401 U.S. at 430, 91 S.Ct. at 853, 28 L.Ed.2d at 163-164. See also Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1370 & n. 7 (5th Cir. 1974)
 
 
 [185]
 United States v. Bethlehem Steel Corp., supra note 109, 446 F.2d at 665
 
 
 [186]
 "A test or other employee selection standard . . . cannot be imposed upon any individual or class protected by title VII where other employees, applicants or members, have not been subjected to that standard. Disparate treatment, for example, occurs where members of a minority or sex group have been denied the same employment, promotion, transfer or membership opportunities as have been made available to those other employees or applicants. Those employees or applicants who have been denied equal treatment, because of prior discriminatory practices or policies, must at least be afforded the same opportunities as had existed for other employees or applicants during the period of discrimination." 29 C.F.R. § 1607.11 (1975)
 
 
 [187]
 See, however, Parts V(C), (D) infra
 
 
 [188]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1382-1390
 
 
 [189]
 As we have heretofore observed, see note 158 supra, the Equal Pay Act forbids attempted compliance with its provisions by "equalization" through a downward revision of pay. 29 U.S.C. § 206(d)(1) (1970). See Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 206-207, 94 S.Ct. at 2233-2234, 41 L.Ed.2d at 16-17
 
 
 [190]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1382-1390
 
 
 [191]
 The judgment defines "cabin attendants" as "all American-based employees of (NWA) whose principal duties consist of providing in-flight cabin service, whether denominated stewardess, purser, flight service attendant, steward, or otherwise." Id. at 1384
 
 
 [192]
 Id. at 1385
 
 
 [193]
 Grouped as backpay, though addressed discretely, are cabin attendants' salaries, pensions, the value of lodgings furnished and allowances for uniform-maintenance. Id. at 1385-1387
 
 
 [194]
 "Equal Pay Act plaintiff(s)" in the judgment are "all female cabin attendants employed by (NWA) who filed timely written consents with this Court, in accordance with 29 U.S.C. § 256 (1970), to become parties plaintiff with respect to the Equal Pay Act aspects of this lawsuit." Id. at 1384
 
 
 [195]
 Id. at 1385-1386
 
 
 [196]
 "Title VII plaintiff(s)" under the judgment are "all female cabin attendants employed by (NWA) at any time on or after July 2, 1965, excluding only those who filed timely elections with this Court to be excluded from this lawsuit in its entirety." Id. at 1384
 
 
 [197]
 See Part V(C) infra
 
 
 [198]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1386-1387
 
 
 [199]
 29 U.S.C. § 255(a) (1970)
 
 
 [200]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1390
 
 
 [201]
 See note 194 supra
 
 
 [202]
 See note 193 supra
 
 
 [203]
 See note 194 supra and accompanying text
 
 
 [204]
 We discuss that finding in Part V-B infra
 
 
 [205]
 See note 230 infra
 
 
 [206]
 Brennan v. Heard, 491 F.2d 1, 3 (5th Cir. 1974); Brennan v. J. M. Fields, Inc., 488 F.2d 443, 448 (5th Cir. 1973), cert. denied, 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974); Brennan v. General Motors Acceptance Corp., 482 F.2d 825, 828-829 (5th Cir. 1973); Coleman v. Jiffy June Farms, Inc., 458 F.2d 1139, 1142 (5th Cir. 1971), cert. denied, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972)
 
 
 [207]
 Coleman v. Jiffy June Farms, Inc., supra note 206, 458 F.2d at 1142
 
 
 [208]
 Hodgson v. Unified School Dist., 21 Wage & Hour Cas. 574, 577 (D.Kan.1973); Boll v. Federal Reserve Bank, 365 F.Supp. 637, 648-649 (E.D.Mo.1973), aff'd, 497 F.2d 335 (1974); Brennan v. Westinghouse Credit Corp., 21 Wage & Hour Cas. 871, 875-876 (E.D.Tenn.1973). See also Dunlop v. New Jersey, 522 F.2d 504, 518 (3d Cir. 1975); Hodgson v. Cactus Craft of Arizona, 481 F.2d 464, 467 (8th Cir. 1973); Hodgson v. Barge, Waggoner & Sumner, Inc., 377 F.Supp. 842, 845 (M.D.Tenn.1972), aff'd, 477 F.2d 598 (6th Cir. 1973)
 
 
 [209]
 Brennan v. Westinghouse Credit Corp., supra note 208, 21 Wage & Hour Cas. at 876
 
 
 [210]
 E. g., Spurr v. United States, 174 U.S. 728, 734-735, 19 S.Ct. 812, 814-815, 43 L.Ed. 1150, 1152-1153 (1899)
 
 
 [211]
 E. g., Nabob Oil Co. v. United States, 190 F.2d 478, 480 (10th Cir.), cert. denied, 342 U.S. 876, 72 S.Ct. 167, 96 L.Ed. 658 (1951)
 
 
 [212]
 See, e. g., United States v. Murdock, 290 U.S. 389, 394-395, 54 S.Ct. 223, 225, 78 L.Ed. 381, 384-385 (1933)
 
 
 [213]
 "It is only in very few criminal cases that 'willfull' means 'done with a bad purpose.' Generally, it means 'no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.' " Townsend v. United States, 68 App.D.C. 223, 229, 95 F.2d 352, 358, cert. denied, 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121 (1938)
 
 
 [214]
 See Spies v. United States, 317 U.S. 492, 497, 63 S.Ct. 364, 367, 87 L.Ed. 418, 422 (1943)
 
 
 [215]
 29 U.S.C. § 251 (1970)
 
 
 [216]
 Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)
 
 
 [217]
 29 U.S.C. § 251 (1970)
 
 
 [218]
 The legislation was the Portal-to-Portal Act of 1947, Act of May 14, 1947, ch. 52, 61 Stat. 84, as amended, 29 U.S.C. §§ 251 et seq. (1970). See also Steiner v. Mitchell, 350 U.S. 247, 253, 76 S.Ct. 330, 334, 100 L.Ed. 267, 272 (1956)
 
 
 [219]
 Act of May 14, 1947, ch. 52, § 6, 61 Stat. 87
 
 
 [220]
 Act of May 14, 1947, ch. 52, § 1, 61 Stat. 84, 29 U.S.C. § 251
 
 
 [221]
 Pub.L. No. 89-601, 80 Stat. 830 (1966)
 
 
 [222]
 Hearings on H.R. 8259 Before the General Subcommittee on Labor of the Committee on Education and Labor 7 (1965) (statement of Secretary Wirtz)
 
 
 [223]
 S.Rep.No.1487, 89th Cong., 2d Sess. 36, 69 (1966); H.R.Rep.No.1366, 89th Cong., 2d Sess. 46, 77 (1966), U.S.Code Cong. & Admin.News 1966, p. 3002
 
 
 [224]
 See text supra at note 199
 
 
 [225]
 See S.Rep.No.1487, 89th Cong., 2d Sess. 1-4 (1966); H.R.Rep.No.1366, 89th Cong., 2d Sess. 4-10 (1966)
 
 
 [226]
 "The proposed coverage brings small local business immediately into coverage. There are no exact figures on how many retail establishments would be affected by the bill, but there are definite indications that the number is substantial. . . . Businessmen state that they will have to reduce their work forces substantially and even then will be faced with the grave problem of whether or not they can remain in business." S.Rep.No.1487, 89th Cong., 2d Sess. 76-77 (statement of Senator Fannin), U.S.Code Cong. & Admin.News 1966, p. 3044
 
 
 [227]
 See note 226 supra
 
 
 [228]
 E. g., Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 208, 94 S.Ct. at 2234-2235, 41 L.Ed.2d at 17; Coles v. Penny, 174 U.S.App.D.C. 277, 283, 531 F.2d 609, 615 (1976)
 
 
 [229]
 As one commentator has observed, "(s)ince virtually every employer knows of the possible applicability of (the Fair Labor Standards Act) to his business, the practical effect of this interpretation is to eliminate the two year statute of limitations from the act. If this were the result Congress intended, it would not have drafted the statute so that the two year period is the rule and the three year period is the exception." Richards, Monetary Awards in Equal Pay Act Litigation, 29 Ark.L.Rev. 328, 338 (1975)
 
 
 [230]
 NWA contends that "willful," in the suit-limitation provision takes on the interpretation given the same work in the criminal provision of the Fair Labor Standards Act, 29 U.S.C. § 216(a) (1970). We do not agree that the criminal construction is to be imparted into the civil provision simply because both provisions are part of the same statute. The purposes of the two sections are entirely different; one punishes as criminal certain specified conduct while the other subserves a policy to which punishment is entirely foreign. Compare Corning Glass Works v. Brennan, supra note 111, 417 U.S. at 207, 94 S.Ct. at 2234, 41 L.Ed.2d at 17. In any event, under § 216's definition of "willful," "(i)t is sufficient if the act was deliberate, voluntary and intentional as distinguished from one committed through inadvertence, accidentally or by ordinary negligence." Nabob Oil Co. v. United States, supra note 211, 190 F.2d at 480. We reach no different conclusion in this case by that definition. See note 232 infra and accompanying text. Compare Coleman v. Jiffy June Farms, Inc., supra note 206, 458 F.2d at 1142
 
 
 [231]
 Compare Brennan v. Heard, supra note 206, 491 F.2d at 3
 
 
 [232]
 In situations of that sort, "the act (is) deliberate, voluntary and intentional as distinguished from one committed through inadvertence, accidentally or by ordinary negligence." See note 230 supra
 
 
 [233]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1390
 
 
 [234]
 Id
 
 
 [235]
 Fed.R.Civ.P. 52(a)
 
 
 [236]
 J.App. 1477-1478
 
 
 [237]
 J.App. 1478
 
 
 [238]
 J.App. 1478-1479
 
 
 [239]
 J.App. 1479
 
 
 [240]
 J.App. 1477-1478
 
 
 [241]
 J.App. 1477-1478
 
 
 [242]
 See text supra at note 234
 
 
 [243]
 See text supra at note 210
 
 
 [244]
 See text supra at note 234
 
 
 [245]
 See text supra at notes 229-232
 
 
 [246]
 See note 230 supra
 
 
 [247]
 See text supra at note 234
 
 
 [248]
 See text supra at notes 214-232
 
 
 [249]
 See Part V(B) infra
 
 
 [250]
 See text supra at note 243
 
 
 [251]
 See text supra at notes 214-232
 
 
 [252]
 See text supra at notes 229-232
 
 
 [253]
 See note 88 supra and accompanying text
 
 
 [254]
 "Any employer who violates the provisions of (the Fair Labor Standards Act) shall be liable to the employee or employees affected in the amount of the unpaid minimum wages, or unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (1970)
 
 
 [255]
 Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 583-584, 62 S.Ct. 1216, 1222-1223, 86 L.Ed. 1682, 1690-1691 (1942)
 
 
 [256]
 See text infra at notes 264-270
 
 
 [257]
 "(I)f the employer shows to the satisfaction of the court that the act or omission giving rise (to the violation) was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of (the Act) as amended, the court may, in its sound discretion, award no liquidated damages or award any amounts thereof not to exceed the amount specified in" § 216(b), supra note 254. 29 U.S.C. § 260 (1970)
 
 
 [258]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1390
 
 
 [259]
 Addison v. Huron Stevedoring Corp., 204 F.2d 88, 93 (2d Cir.), cert. denied, 346 U.S. 877, 74 S.Ct. 120, 98 L.Ed. 384 (1953)
 
 
 [260]
 Id. at 93
 
 
 [261]
 Id. See also note 268 infra
 
 
 [262]
 Addison v. Huron Stevedoring Corp., supra note 259, 204 F.2d at 93
 
 
 [263]
 Fed.R.Civ.P. 52(a); Addison v. Huron Stevedoring Corp., supra note 259; Hodgson v. Miller Brewing Co., supra note 135, 457 F.2d at 228; Day & Zimmerman v. Reid, 168 F.2d 356, 360 (8th Cir. 1948); Lassiter v. Guy F. Atkinson Co., 176 F.2d 984, 993, 21 A.L.R.2d 1313 (9th Cir. 1949)
 
 
 [264]
 Supra note 255
 
 
 [265]
 Portal-to-Portal Act, H.R.Rep.No.71, at 7-8 (1947)
 
 
 [266]
 316 U.S. at 583-584, 62 S.Ct. at 1222-1223, 86 L.Ed. at 1690-1691
 
 
 [267]
 Rothman v. Publicker Indus., Inc., 201 F.2d 618, 620 (3d Cir. 1953)
 
 
 [268]
 29 C.F.R. § 790.22(b) (1975), provides:
 The conditions prescribed as prerequisites to (the court's denial of liquidated damages) are two: (1) The employer must show to the satisfaction of the court that the act or omission giving rise to such action was in good faith; and (2) he must show also, to the satisfaction of the court, that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act. . . . If, . . . the employer does not show to the satisfaction of the court that he as met the two conditions mentioned above, the court is given no discretion by the statute, and it continues to be the duty of the court to award liquidated damages (footnote omitted).
 Rothman v. Publicker Indus., Inc., supra note 267, 201 F.2d at 620 (under the Portal-to-Portal Act, a delinquent employer seeking to escape payment of liquidated damages has "a plain and substantial burden of persuading the court that his failure to obey the (Fair Labor Standards Act) was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict."). See also Wright v. Carrigg, 275 F.2d 448 (4th Cir. 1960); McClanahan v. Mathews, 440 F.2d 320, 322-323, 26 A.L.R. Fed. 598 (6th Cir. 1971). Cf. National Automatic Laundry & Cleaning Council v. Shultz, supra note 127, 143 U.S.App.D.C. at 282 & n. 6, 443 F.2d at 697 & n. 6, and see generally Richards, Monetary Awards in Equal Pay Act Litigation, 29 Ark.L.Rev. 328, 347-354 (1975).
 
 
 [269]
 McClanahan v. Mathews, supra note 268, 440 F.2d at 323; Thomas v. Louisiana, 348 F.Supp. 792 (W.D.La.1972); 29 C.F.R. § 790.22(b) (1974); contra, Baird v. Wagoner Transp. Co., 18 Wage & Hour Cas. 597 (W.D.Mich.1968), aff'd, 425 F.2d 407 (6th Cir.), cert. denied, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970)
 
 
 [270]
 McClanahan v. Mathews, supra note 268, 440 F.2d at 322-324
 
 
 [271]
 The court's ruling on liquidated damages has been characterized as one "of particular interest and very doubtful correctness." Richards, Monetary Awards in Equal Pay Act Litigation, 29 Ark.L.Rev. 328, 352 (1975). The degree to which Congress' 1947 modification may have changed the character of liquidated damages from compensatory to punitive allowances is a matter we need not now decide. See generally id. at 348-350; Russell v. American Tobacco Co., 528 F.2d 357, 366 (4th Cir. 1975), cert. denied, 935 U.S. 425, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976)
 
 
 [272]
 See note 268 supra
 
 
 [273]
 See note 268 supra
 
 
 [274]
 E. g., Ponds v. Braniff Airways, 500 F.2d 161 (5th Cir. 1974); Airline Stewards & Stewardess' Ass'n, Local 550, v. American Airlines, 490 F.2d 636 (7th Cir. 1973), cert. denied, 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 773 (1974); Sprogis v. United Air Lines, 444 F.2d 1194 (7th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); Gerstle v. Continental Airlines, 358 F.Supp. 545 (D.Colo.1973); Cooper v. Delta Airlines, 274 F.Supp. 781 (E.D.La.1967); Defiguiernedo v. Trans World Airlines, 322 F.Supp. 1384 (S.D.N.Y.1976); Maguire v. Trans World Airlines, 55 F.R.D. 48 (S.D.N.Y.1972)
 
 
 [275]
 Employee silence is very different from an absence of complaint by Department of Labor officials following examination of the employer's system. See Retail Store Employees Union, Local 400 v. Drug Fair Community Drug Co., 307 F.Supp. 473, 479-480 (D.D.C.1969); Hodgson v. Barge, Wagoner & Sumner, Inc., supra note 208, 377 F.Supp. at 1845
 
 
 [276]
 Van Dyke v. Bluefield Gas Co., 210 F.2d 620 (4th Cir.), cert. denied, 347 U.S. 1014, 74 S.Ct. 870, 98 L.Ed. 1137 (1954); General Elec. Co. v. Porter, 208 F.2d 805 (9th Cir. 1953); Harp v. Continental/Moss-Gordin Gin Co., 259 F.Supp. 198 (M.D.Ala.1966), aff'd, 386 F.2d 995 (5th Cir. 1967); Kelly v. Ballard, 298 F.Supp. 1301 (S.D.Cal.1969); Bauler v. Pressed Steel Car Co., 81 F.Supp. 172 (N.D.Ill.1948), aff'd, 182 F.2d 357 (2d Cir. 1950); Peperissa v. Coren-Indik, Inc., 298 F.Supp. 34 (E.D.Pa.1969)
 On the other hand, maintenance of a practice of "highly questionable legality" constitutes bad faith. Albemarle Paper Co. v. Moody, supra note 174, 422 U.S. at 422, 95 S.Ct. at 2374, 45 L.Ed.2d at 299. Lack of reasonable grounds has also been found where an employer waited for an impending Supreme Court decision on the validity of amending legislation, Thomas v. Louisiana, supra note 269, 348 F.Supp. at 796; where a Supreme Court decision in another case had made it clear that the employer's defense was not valid, King v. Board of Educ., 435 F.2d 295, 298 (7th Cir. 1970), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1971); where the employer continued a course of conduct after inspectors indicated that it violated the Act, American Newspaper Guild v. Republican Publishing Co., 8 Wage & Hour Cas. 140, aff'd, 172 F.2d 943 (1st Cir. 1949); where the employer claimed that he did not know the details of the job in issue, Day & Zimmerman v. Reid, supra note 263, 168 F.2d at 359-360.
 
 
 [277]
 See text supra at notes 264-270
 
 
 [278]
 See note 270 supra and accompanying text
 
 
 [279]
 In Crago v. Rockwell Mfg. Co., 301 F.Supp. 743 (W.D.Pa.1969), it was held that "(a)lthough defendant did not do all that might have been done by a reasonable employer in determining whether it was in compliance with the Act, such as securing from its legal department a reliable opinion incident to plaintiff's employment, and again seeking the advice of the Wage and Hour Division, this circumstance does not preclude defendant from protection under (the liquidated damages provision)." Id. at 748. The court then found that the defendant had acted in good faith on reasonable grounds to believe it was not violating the Act, but still awarded partial liquidated damages "representing plaintiff's loss of use of the overtime compensation due him . . . ." Id
 The employee litigants also complain that the provision of the judgment on liquidated-damages is ambiguous in one respect and deficient in another. Since we are remanding the matter of liquidated damages in toto for reconsideration by the District Court, to which any further grievance by either side may be addressed, we do not pass on these contentions on this appeal.
 
 
 [280]
 The elements of backpay are the same as for Equal Pay Act plaintiffs. See note 193 supra
 
 
 [281]
 The court's judgment also directed NWA to pay the difference between one-half of the value of double rooms provided employees on layovers and the value of a single room had it been provided. Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1386, 1387. NWA was also ordered to pay to eligible Title VII plaintiffs, see note 196 supra, a uniform-cleaning allowance, id. at 1387, thus matching a similar provision in favor of Equal Pay Act plaintiffs. See text supra at note 78
 
 
 [282]
 As we have heretofore observed, there will be no overlapping recovery by anyone entitled to benefit from both Title VII and the Equal Pay Act since in all instances the Title VII backpay recovery is cut off on "the day preceding the commencement of her Equal Pay Act recovery period . . . ." Id. at 1386
 
 
 [283]
 This was the effective date of the enforcement provision of Title VII upon which the District Court predicated this aspect of its judgment. See Pub.L.No.88-352, tit. VII, § 716(a), (b), 78 Stat. 266 (1964)
 
 
 [284]
 Prior to the 1972 amendments, there was no statutory limitation upon the period for which Title VII backpay might be awarded. Pub.L.No.88-352, tit. VII, § 706(g), 78 Stat. 261, 42 U.S.C. § 2000e-5(g) (1970)
 
 
 [285]
 42 U.S.C. § 2000e-5(g) (Supp. II 1972) in relevant part provides:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful practice), or any other equitable relief as the court deems appropriate. Backpay liability shall not accrue from a date more than two years prior to the filing of a charge with the (Equal Employment Opportunity) Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.
 
 
 [286]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1390
 
 
 [287]
 Equal Employment Opportunity Act of 1972, Pub.L.No.92-261, § 14, 86 Stat. 113
 
 
 [288]
 On July 14, 1970, the Commission notified the employees that they were entitled to initiate a civil action, and on July 15, 1970, the complaint was filed in the District Court
 
 
 [289]
 See Bing v. Roadway Express, 485 F.2d 441, 453 n. 14 (5th Cir. 1973); EEOC v. Detroit Edison Co., 515 F.2d 301, 315 (6th Cir. 1975)
 
 
 [290]
 The employees rely on assertions during legislative consideration of the amendments that the 1964 version permitted backpay retroactively to the effective date of the Act, i. e., that there was no statutory limitation. Their argument based on this congressional spectre-raising is addressed infra, text and notes at notes 292, 294
 NWA attempts to persuade us that the absence of a back-pay limit in the 1964 Act restricts the District Court's discretion to "the beginning of the period in which Congress stated it was reasonable to expect someone to complain, viz., 90 days before the filing" of the charge with the Commission. Reply Brief of Appellant NWA at 32. Since such a contention would cut the heart out of the well-accepted "continuing violation" theory, see, e. g., Macklin v. Spector Freight Sys., Inc., supra note 112, 156 U.S.App.D.C. at 77-78, 478 F.2d at 987-988, we concur in the Fifth Circuit's analysis in United States v. Georgia Power Co., 474 F.2d 906, 922-923 (5th Cir. 1973), in rejecting such a limit. NWA's second contention is directed to support of the District Court's use of the two-year limit specified in the amendments as an index of reasonableness in the exercise of its discretion. That argument too is addressed infra at notes 320-321.
 
 
 [291]
 Regional Rail Reorganization Act Cases, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320, 346-347 (1974)
 
 
 [292]
 July 2, 1965. Pub.L.No.88-352, tit. VII, § 716(a), 78 Stat. 266 (1964)
 
 
 [293]
 See 42 U.S.C. § 2000e-5(g) (Supp. II 1972)
 
 
 [294]
 Cf. Manchester Modes, Inc. v. Schuman, 426 F.2d 629, 633 (2d Cir. 1971)
 
 
 [295]
 See generally 2 J. Moore, Federal Practice P 3.07(2)-(3) (2d ed. 1948); Note, Federal Statutes Without Limitations Provisions, 53 Colum.L.Rev. 68 (1953)
 
 
 [296]
 E. g., Runyon v. McCrary, 427 U.S. 160, 180, 96 S.Ct. 2586, 2599, 49 L.Ed.2d 415, 430-431 (1976); UAW v. Hoosier Cardinal Corp., 383 U.S. 696, 701-704, 86 S.Ct. 1107, 1110-1113, 16 L.Ed.2d 192, 197-199 (1966); Cope v. Anderson, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947); O'Sullivan v. Felix, 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980 (1914); Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); Campbell v. Haverhill, 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280 (1895)
 
 
 [297]
 See Johnson v. Railway Express Agency, supra note 112, 421 U.S. at 464, 95 S.Ct. at 1722, 44 L.Ed.2d at 303-304
 
 
 [298]
 See, e. g., Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); cf. UAW v. Hoosier Cardinal Corp., supra note 296, 383 U.S. at 701-703, 86 S.Ct. at 1110-1112, 16 L.Ed.2d at 197-198; Note, Federal Statutes Without Limitations Provisions, 53 Colum.L.Rev. 68 (1953); see generally Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U.Pa.L.Rev. 797 (1957)
 
 
 [299]
 See Republic Pictures Corp. v. Kappler, 151 F.2d 543, 546-547, 162 A.L.R. 228 (8th Cir. 1945), aff'd, 327 U.S. 757, 66 S.Ct. 523, 90 L.Ed. 991 (1946), cited with approval in Johnson v. Railway Express Agency, supra note 112, 421 U.S. at 462 n. 7, 95 S.Ct. at 1721 n. 7, 44 L.Ed.2d at 302-303 n. 7
 
 
 [300]
 The statutes cited to us by the parties contain two- or three-year limits. Since we remand to the District Court for a determination of which provision is appropriate to this case, we have no occasion to decide whether either of these periods is so short as impermissibly to frustrate the federal right of action asserted. We note, however, that other circuits adopting state rules for Title VII have applied periods of about that length. EEOC v. Detroit Edison Co., supra note 289, 515 F.2d at 315 (three years); United States v. Georgia Power Co., supra note 290, 474 F.2d at 924 (two years). See also Runyon v. McCrary, supra note 296, 427 U.S. at 180-181, 96 S.Ct. at 2599-2600, 49 L.Ed.2d at 430-433
 
 
 [301]
 Johnson v. Railway Express Agency, supra note 112; O'Sullivan v. Felix, supra note 296
 
 
 [302]
 Macklin v. Spector Freight Sys., Inc., supra note 112, 156 U.S.App.D.C. at 85 n. 30, 478 F.2d at 985 n. 30
 
 
 [303]
 Johnson v. Railway Express Agency, supra note 112, 421 U.S. at 464, 95 S.Ct. at 1722, 44 L.Ed.2d at 303-304
 
 
 [304]
 42 U.S.C. § 1988 (1970), which provides:
 The jurisdiction in civil . . . matters conferred on the district courts by the provisions of this Title . . . shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil . . . cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . .
 Section 1988 is a product of the Reconstruction-era civil rights acts, and as such controls by its terms only rights of action predicated upon those statutes, e. g., 42 U.S.C. §§ 1981-1983, 1985-1992 (1970). Without deciding whether § 1988 dictates recourse to state law in Title VII cases, we note that one court has so held. Claiborne v. Illinois Cent. R. R., 401 F.Supp. 1022, 1026 (E.D.La.1975) (applying state law on damages). But see Rogers v. Exxon Research & Eng'r Co., 404 F.Supp. 324, 333 (D.N.J.1975).
 
 
 [305]
 See cases cited supra note 300
 
 
 [306]
 This is normally determined by reference to the law of the forum state. United States v. Georgia Power Co., supra note 290, 474 F.2d at 923; 2 J. Moore, Federal Practice P 3.07(2) (2d ed. 1948). See also Runyon v. McCrary, supra note 296, 427 U.S. at 180-181, 96 S.Ct. at 2599-2600, 49 L.Ed.2d at 430-433
 
 
 [307]
 Supra note 174
 
 
 [308]
 Albemarle Paper Co. v. Moody, supra note 174, 422 U.S. at 417, 95 S.Ct. at 2371, 45 L.Ed.2d at 296
 
 
 [309]
 "The finding of an unfair labor practice and discriminatory discharge is presumptive proof that some back pay is owed by the employer," NLRB v. Mastro Plastics Corp., 354 F.2d 170, 178 (CA2 1965) (cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966)). While the backpay decision rests in the NLRB's discretion, and not with the courts, NLRB v. Rutter-Rex Mfg. Co., 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405, 410-411 (1969), the Board has from its inception pursued "a practically uniform policy with respect to these orders requiring affirmative action." NLRB, First Annual Report 124 (1936). "(I)n all but a few cases involving discriminatory discharges, discriminatory refusals to employ or reinstate, or discriminatory demotions in violation of section 8(3), the Board has ordered the employer to offer reinstatement to the employee discriminated against and to make whole such employee for any loss of pay that he has suffered by reason of the discrimination." NLRB, Second Annual Report 148 (1937)
 Id. at 420 n. 12, 95 S.Ct. at 2373 n. 12, 45 L.Ed.2d at 298 n. 12.
 
 
 [310]
 Id. at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 299 (emphasis added). The Court held that good faith by the employer was no reason to deny backpay to the employee. That result "would read the 'make whole' purpose right out of Title VII, for a worker's injury is no less real simply because his employer did not inflict it in 'bad faith.' " Id. at 422, 95 S.Ct. at 2374, 45 L.Ed.2d at 299 (footnote omitted). The Court, however, left open the possibility of a denial based on laches; the plaintiffs had initially disclaimed any interest in backpay, asserting their backpay claim for the first time five years after the complaint was filed. Id. at 424, 95 S.Ct. at 2374-2375, 45 L.Ed.2d at 300-301
 
 
 [311]
 "It is necessary, therefore, that if a district court does decline to award backpay, it carefully articulate its reasons." Id. at 421 n. 14, 95 S.Ct. at 2373 n. 14, 45 L.Ed.2d at 299 n. 14
 
 
 [312]
 Id. at 441, 95 S.Ct. at 2384, 45 L.Ed.2d at 311 (Marshall, J., concurring)
 
 
 [313]
 Id. at 443-444, 95 S.Ct. at 2385, 45 L.Ed.2d at 313 (Rehnquist, J., concurring); Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1125 (5th Cir. 1969)
 
 
 [314]
 422 U.S. at 446-447, 95 S.Ct. at 2387, 45 L.Ed.2d at 314-315
 
 
 [315]
 Id. at 444, 95 S.Ct. at 2385, 45 L.Ed.2d at 313. The description of the purpose behind the 1972 revision of the backpay provision emphasized the court's discretion. Senator Williams said the provision was
 to give the court wide discretion, as has been generally exercised by the courts under existing law, in fashioning the most complete relief possible. In dealing with the present section 706(g) (42 U.S.C. § 2000e-5(g)) the courts have stressed that the scope of relief under that section of the Act is intended to make the victims of unlawful discrimination whole, and that the attainment of this objective rests not only upon the elimination of the particular unlawful employment practice complained of but also requires that the consequence and effects of the unlawful employment practices be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination. This broad reading of the need for effective remedies under this subsection is intended to be preserved in this bill in order to effectively combat the presence of employment discrimination.
 Section-by-section analysis of S. 2515 by Senator Williams, 118 Cong.Rec. 4942 (1972); see also his statement id. at 7168.
 
 
 [316]
 422 U.S. at 417-418, 95 S.Ct. at 2371-2372, 45 L.Ed.2d at 296-297, quoting United States v. N. L. Indus., Inc., 479 F.2d 354, 379 (8th Cir. 1973)
 
 
 [317]
 422 U.S. at 418, 95 S.Ct. at 2372, 45 L.Ed.2d at 297
 
 
 [318]
 See id. at 422 n.13, 95 S.Ct. at 2373 n.13, 45 L.Ed.2d at 298 n.13
 
 
 [319]
 See note 311 supra
 
 
 [320]
 422 U.S. at 421-422, 95 S.Ct. at 2373, 45 L.Ed.2d at 299. Since one of the purposes of the two-year limitation was to "preclude the threat of enormous backpay liability which could be utilized to coerce employers and labor organizations into surrendering their fundamental rights to a fair hearing and due process," one may assume that Congress believed cases already in the courts were less in need of such protection. 117 Cong.Rec. 31981 (1971) (statement of Mr. Erlenborn). Cf. his remarks id. at 26555
 
 
 [321]
 Thus we dispose of NWA's contention that the District Court should have denied backpay entirely or should at least have limited it to only 90 days. With Rios v. Enterprise Ass'n Steamfitters, Local 638, 400 F.Supp. 988, 992 (S.D.N.Y.1975), relying on the District Court's decision in this case to limit an award to two years, we must respectfully disagree
 
 
 [322]
 In 1972, many of the time provisions of the Civil Rights Act of 1964 were expanded. The ninety-day time provision at issue in this case was increased to 180 days and reclassified as 42 U.S.C. § 2000e-5(e) (Supp. II 1972). The amended provision is not applicable to this case. See text supra at notes 287-289
 
 
 [323]
 42 U.S.C. § 2000e-5(d) (1970). That section also sets forth the timing to be observed when the complaining party must file with a state or local agency before filing with the Commission
 
 
 [324]
 In Albemarle Paper Co. v. Moody, supra note 174, 422 U.S. at 414 n.8, 95 S.Ct. at 2370 n.8, 45 L.Ed.2d at 294 n.8, the Supreme Court indicated its agreement with courts which had considered the issue and had unanimously concluded that backpay might be awarded on a class basis without filings with the Commission by each member
 
 
 [325]
 "The purpose of (the filing requirement) is to provide for notice to the charged party and to bring to bear the voluntary compliance and conciliation functions of the (Commission). Also, . . . another important function of filing the charge is to permit the (Commission) to determine whether the charge is adequate. Finally, the charge determines the scope of the alleged violation and thereby serves to narrow the issues for prompt adjudication and decision
 "It is apparent that each of these purposes is served when any charge is filed and a proper suit follows which fairly asserts grievances common to the class to be afforded relief in the court. There can be no claim of surprise in such a situation. . . . '(N)o procedural purpose could be served by requiring scores of substantially identical grievances to be processed through (the Commission) when a single charge would be sufficient to effectuate both the letter and spirit of Title VII.' " Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 720 (7th Cir. 1969); see also Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 499 (5th Cir. 1968).
 
 
 [326]
 See, e. g., Cohen v. District of Columbia Nat'l Bank, 59 F.R.D. 84, 90 (D.D.C.1972); Lamb v. United Sec. Life Co., 59 F.R.D. 25, 35 n.5 (S.D.Iowa 1972)
 
 
 [327]
 Fed.R.Civ.P. 23
 
 
 [328]
 28 U.S.C. § 2072 (1970), providing in part explicitly that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right . . . ." See also United States v. Sherwood, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058, 1063 (1941) (discussing the precursor of § 2072, the Act of June 19, 1934, 48 Stat. 1064); Sibbach v. Wilson & Co., 312 U.S. 1, 9-10, 61 S.Ct. 422, 424-425, 85 L.Ed. 479, 482-483 (1941) (same); Brennan v. Silvergate Dist. Lodge No. 50, 503 F.2d 800, 804 (9th Cir. 1974)
 
 
 [329]
 Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 246 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); Mather v. Western Air Lines, 59 F.R.D. 535 (C.D.Cal.1973); Marshall v. Electric Hose & Rubber Co., 68 F.R.D. 287, 294 (D.Del.1975); Jones v. United Gas Improvement Corp., 68 F.R.D. 1, 15-16 (E.D.Pa.1975)
 
 
 [330]
 Laffey v. Northwest Airlines, supra note 1, 366 F.Supp. at 790 (Concl. 6)
 
 
 [331]
 Macklin v. Spector Freight Sys., Inc., supra note 112, 156 U.S.App.D.C. at 77-78, 478 F.2d at 987-988; Wetzel v. Liberty Mut. Ins. Co., supra note 329, 508 F.2d at 246; Cox v. United States Gypsum Co., 409 F.2d 289, 290-291 (7th Cir. 1969)
 
 
 [332]
 Wetzel v. Liberty Mut. Ins. Co., supra note 329, 508 F.2d at 246; Terry v. Bridgeport Brass Co., 519 F.2d 806, 808 (7th Cir. 1975); Olson v. Rembrandt Printing Co., 511 F.2d 1228, 1233-1234 (8th Cir. 1975); Collins v. United Airlines, 514 F.2d 594, 596-597 (9th Cir. 1975)
 
 
 [333]
 Collins v. United Airlines, supra note 332, 514 F.2d at 596; Olson v. Rembrandt Printing Co., supra note 332, 511 F.2d at 1234
 
 
 [334]
 J.App. 61-63
 
 
 [335]
 J.App. 67-71. There was also a notice which was sent only to individuals whose employment terminated prior to a designated date. J.App. 63-67. That notice informed recipients of the class action and of their automatic inclusion in the Title VII class unless they opted to be excluded from the litigation. Those individuals could not share in the Equal Pay Act recovery because their respective claims were barred by the Act's statute of limitations. See note 199 supra and accompanying text
 
 
 [336]
 J.App. 69
 
 
 [337]
 This group can consist only of those whose employment with NWA was terminated between the earliest possible recovery date for Equal Pay Act violations and ninety days before the filing of charges with the Commission. Those who left the company's employ between those dates would be barred from a Title VII recovery but not from an Equal Pay Act recovery had they filed the consents
 
 
 [338]
 See, e. g., American Fire & Cas. Co. v. Finn, 341 U.S. 6, 17-18, 71 S.Ct. 534, 541-542, 95 L.Ed. 702, 710-711 (1951); Ahrens v. Clark, 335 U.S. 188, 193, 68 S.Ct. 1443, 1445-1446, 92 L.Ed. 1898, 1901-1902 (1948); United States v. Griffin, 303 U.S. 226, 229, 58 S.Ct. 601, 602-603, 82 L.Ed. 764, 766-767 (1938); Green v. Obergfell, 73 App.D.C. 298, 306-307, 121 F.2d 46, 54-55, cert. denied, 314 U.S. 637, 62 S.Ct. 72, 86 L.Ed. 511 (1941)
 
 
 [339]
 See, e. g., Flast v. Cohen, 392 U.S. 83, 88 n.2, 88 S.Ct. 1942, 1946, n.2, 20 L.Ed.2d 947, 955 n.2 (1968); United States v. Griffin, supra note 338, 303 U.S. at 229, 58 S.Ct. at 602-603, 82 L.Ed. at 766-767; Fortier v. New Orleans Nat'l Bank, 112 U.S. 439, 444, 5 S.Ct. 234, 236, 28 L.Ed. 764, 765-766 (1884); James v. Lusby, 162 U.S.App.D.C. 352, 356, 499 F.2d 488, 492 (1974)
 
 
 [340]
 Glus v. Brooklyn E. Dist. Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959), where a limitation period was contained in the statute creating a new right, and thus historically was to be seen as a limitation on the right itself, and the Court held that the defendant could be estopped from asserting the limitation as a defense
 
 
 [341]
 See Alexander v. Gardner-Denver Co., supra note 96, 415 U.S. at 47, 94 S.Ct. at 1019, 39 L.Ed.2d at 157-158; McDonnell Douglass Corp. v. Green, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668, 675-676 (1973); Macklin v. Spector Freight Sys., Inc., supra note 112, 156 U.S.App.D.C. at 76, 478 F.2d at 986
 
 
 [342]
 Reeb v. Economic Opportunity, Atlanta Inc., 516 F.2d 924 (5th Cir. 1975); Franks v. Bowman Transp. Co., 495 F.2d 398 (5th Cir. 1974), aff'd in part and rev'd in part, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); Culpepper v. Reynolds Metal Co., 421 F.2d 888 (5th Cir. 1970); Malone v. North Am. Rockwell Corp., 457 F.2d 779 (9th Cir. 1972); Sanchez v. Trans World Airlines, 499 F.2d 1107 (10th Cir. 1970)
 
 
 [343]
 See, e. g., Sanchez v. Trans World Airlines, supra note 342; Moore v. Sunbeam Corp., 459 F.2d 811, 826-827 (7th Cir. 1972); Malone v. North Am. Rockwell Corp., supra note 342; but see, Guy v. Robbins & Myers, Inc., 525 F.2d 124 (6th Cir. 1975), cert. granted, 425 U.S. 950, 96 S.Ct. 1723, 48 L.Ed.2d 193 (1976)
 
 
 [344]
 Reeb v. Economic Opportunity, Atlanta Inc., supra note 342, 516 F.2d at 931. In reaching its decision the court relied in part on a prior decision of the Fifth Circuit, Franks v. Bowman Transp. Co., supra note 342, wherein the court held that constructive receipt of a "right to sue" letter was inadequate to start the running of the time period within which the claimant had to file his court action. The court ruled that only actual notice would set the time period in motion because "Congress did not intend to condition a claimant's right to sue under Title VII on fortuitous circumstances or events beyond his control which are not spelled out in the statute." 495 F.2d at 404
 
 
 [345]
 Senator Case, one of the floor managers in the Senate of the House bill, H.R. 7152, stated that the six-month limit on filing with the Commission contained in that bill was "to avoid the pressing of 'stale' claims." 110 Cong.Rec. 7243 (1964). Senator Humphrey, commenting on the differences between H.R. 7152 and the substitute Senate bill, S. 656, which was eventually passed by the Senate, referred to its ninety-day time period as a "period of limitations." Id. at 12723
 
 
 [346]
 Beverly v. Lone Star Lead Constr. Corp., 437 F.2d 1136, 1138 (5th Cir. 1971); Sanchez v. Standard Brands, Inc., 431 F.2d 455, 461 (5th Cir. 1970); Harris v. Walgreen's Dist. Center, 456 F.2d 588, 591 (6th Cir. 1972)
 
 
 [347]
 Love v. Pullman, 404 U.S. 522, 527, 92 S.Ct. 616, 619, 30 L.Ed.2d 679, 685 (1972). As we have already noted, the Supreme Court has held that not all members of a class need to individually file with the Commission. See note 324 supra. This is some indication that the Court does not regard the act of filing as a jurisdictional prerequisite
 
 
 [348]
 Supra note 228
 
 
 [349]
 Coles v. Penny, supra note 228, 174 U.S.App.D.C. at 284, 531 F.2d at 616 (footnote omitted)
 
 
 [350]
 Id
 
 
 [351]
 Our holdings find support in the interpretation the courts of appeals have uniformly given to comparable time provisions in the National Labor Relations Act, 29 U.S.C. § 160(b) (1970). Section 160(b) provides in part that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge." The courts that have construed this provision have all concluded that it is a statute of limitations, not a limitation on the jurisdiction of the National Labor Relations Board. See NLRB v. A. E. Nettleton Co., 241 F.2d 130, 133 (2d Cir. 1957); Shumate v. NLRB, 452 F.2d 717, 720 (4th Cir. 1971); NLRB v. Itasco Cotton Mfg. Co., 179 F.2d 504, 506-507 (5th Cir. 1950); NLRB v. Local 264, Laborers' Int'l Union, 529 F.2d 778, 781-785 (8th Cir. 1976). The analogy to the National Labor Relations Act is particularly significant in light of the Supreme Court's reliance on it when interpreting Title VII. Franks v. Bowman Transp. Co., supra note 342, 424 U.S. at 770, 96 S.Ct. at 1267, 47 L.Ed.2d at 465-466; Albemarle Paper Co. v. Moody, supra note 174, 422 U.S. at 419-421, 95 S.Ct. at 2372-2373, 45 L.Ed.2d at 297-299
 
 
 [352]
 Trial Tr. at 3571
 
 
 [353]
 Company-Appellants Combined Reply Brief and Brief on Cross-Appeal at 33
 
 
 [354]
 Laffey v. Northwest Airlines, supra note 1, 374 F.Supp. at 1385
 
 
 [355]
 Id. at 1385-1386
 
 
 [356]
 Fed.R.Civ.P. 15(b), quoted in relevant part infra text at note 364
 
 
 [357]
 Fed.R.Civ.P. 14(a), quoted in relevant part infra note 359
 
 
 [358]
 J.App. 339-340
 
 
 [359]
 "At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him. The third-party plaintiff need not obtain leave to make the service if he files the third-party complaint not later than 10 days after he serves his original answer. Otherwise he must obtain leave on motion upon notice to all parties to the action. . . ." Fed.R.Civ.P. 14(a)
 
 
 [360]
 See note 359 supra
 
 
 [361]
 General Taxicab Ass'n v. O'Shea, 71 App.D.C. 327, 329, 109 F.2d 671, 673 (1940); Farmers & Merchants Mut. Life Ins. Co. v. Pulliam, 481 F.2d 670 (10th Cir. 1973); Kopan v. George Washington Univ., 67 F.R.D. 36, 38 (D.D.C.1975). See East Hampton DeWitt Corp. v. State Farm Mut. Auto. Ins. Co., 490 F.2d 1234, 1246 (2d Cir. 1973). Cf. Southern Ry. Co. v. Fox, 339 F.2d 560, 563 (5th Cir. 1964)
 
 
 [362]
 Merritt-Chapman & Scott Corp. v. Frazier, 289 F.2d 849, 856 (9th Cir.), cert. denied, 368 U.S. 835, 82 S.Ct. 60, 7 L.Ed.2d 36 (1961); United States Fidelity & Guar. Co. v. Perkins, 388 F.2d 771, 773 (10th Cir. 1968); Kopan v. George Washington Univ., supra note 361, 67 F.R.D. at 38. See generally 3 J. Moore, Federal Practice P 14.04 (2d ed. 1948); 6 C. Wright & A. Miller, Federal Practice § 1442 (1971)
 
 
 [363]
 Compare East Hampton DeWitt Corp. v. State Farm Mut. Auto. Ins. Co., supra note 361, where a defendant attempted to serve a third-party complaint under Rule 14 on the plaintiff in the litigation shortly before the trial date. The motion was denied, and the court found no reason to disturb the ruling of the trial judge, who was found to have acted well within his discretion. Id. at 1246. Accord, Merritt-Chapman & Scott Corp. v. Frazier, supra note 362; General Elec. Co. v. Irvin, 274 F.2d 175, 178 (6th Cir. 1960) ("the timeliness of the motion is an urgent factor governing the exercise of (Rule 14) discretion"). Given this case law, it must be said a fortiori that a motion under Rule 14(a) made more than a year and a half after the completion of trial and found by the trial judge to be untimely is rarely to be disturbed on appeal
 
 
 [364]
 Fed.R.Civ.P. 15(b)
 
 
 [365]
 Supp.App. to Brief of Airline Pilots Association, International at 3-4, hereinafter cited "Supp.App."
 
 
 [366]
 Supp.App. 2
 
 
 [367]
 Supp.App. 4
 
 
 [368]
 J.App. 76
 
 
 [369]
 J.App. 78
 
 
 [370]
 Once an issue has been tried by express or implied consent of the parties, Rule 15(b) requires it be treated as if raised by the pleadings. Rosden v. Leuthold, 107 U.S.App.D.C. 89, 92, 274 F.2d 747, 750 (1960). Where the question is whether that is the case however, the essential inquiry is the understanding of the parties as to whether the unpleaded issue was being contested. MBI Motor Co. v. Lotus East, Inc., 506 F.2d 709, 711 (6th Cir. 1974). See Joiner Sys., Inc. v. AVM Corp., 517 F.2d 45, 49 (3d Cir. 1975). See also Kanelos v. Kettler, 132 U.S.App.D.C. 133, 136-137 n.15, 406 F.2d 951, 954-955 n.15 (1968). The trial judge's answer to that inquiry is reviewable only for abuse of discretion. Macris v. Sociedad Maritima San Nicolas, 245 F.2d 708, 711 (2d Cir. 1957), cert. denied, 355 U.S. 922, 78 S.Ct. 364, 2 L.Ed.2d 353 (1958); Cole v. Layrite Prods. Co., 439 F.2d 958, 961 (9th Cir. 1971). Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77, 87 (1971); Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222, 225-226 (1962) on the discretion enjoyed by the trial judge under Rule 15(a). He is in a far better position than we to determine the understanding under which the parties proceeded. Where the new issue or theory is raised only after trial, courts of appeals have been loathe to overturn the decision of the trial judge that it was not tried by consent. E. g., Macris v. Sociedad Maritima San Nicolas, supra ; Bettes v. Stonewall Ins. Co., 480 F.2d 92, 94 (5th Cir. 1973); Saalfrank v. O'Daniel, 533 F.2d 325, 330 (6th Cir. 1976). Cf. Tasty Baking Co. v. Cost of Living Council, 529 F.2d 1005, 1011 (Em.App.1975). Saalfrank, supra, is particularly persuasive here. There the plaintiff sought to realign parties after trial to place a party theretofore liable only as an indemnitor in a position of direct liability. The trial judge's refusal was sustained on appeal, the court noting that though "(i)n certain circumstances Rule 15 . . . may be availed of to permit an amendment after judgment and a realigning of parties . . . this may only be done if all parties have notice of the issues being tried and no prejudice will result." 533 F.2d at 330. Possible prejudice was found in the indemnitor's waiver of jury trial. Id. Cf. Komie v. Buehler Corp., 449 F.2d 644, 648 (9th Cir. 1971) (Rule 15(a) motion to amend denied where failure to raise issue earlier prejudiced party vis-a-vis discovery)
 
 
 [371]
 See Part V(B) supra
 
 
 [372]
 See Part V(C) supra
 
 
 [373]
 See Part V(D) supra